Filed 8/25/11

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                                          )
                                                     )
      Plaintiff and Respondent,       )
                                                     )        S076582
      v.                               )
                                                     )
ERVEN R. BLACKSHER,                                  )
                                                     )      Alameda County
      Defendant and Appellant.          )   Super. Ct. No. 125666
_____)

A jury found defendant Erven R. Blacksher guilty of the first degree murder of his nephew, the second degree murder of his sister, and being a felon in possession of a firearm.[1] It also found true the firearm-use allegations and the special circumstance of multiple murder.[2] The jury concluded defendant was sane and returned a verdict of death.

This appeal is automatic. We affirm.

---

[1] Penal Code sections 187, 189, and 12021. All further statutory references are to the Penal Code unless otherwise indicated.
[2] Sections 1203.06, 12022.5, and 190.2, subd. (a)(3).

## I. FACTS AND PROCEEDINGS

### A. Guilt Phase

#### 1. Prosecution's case

In 1989, after the death of his father, defendant moved in with his mother, Eva Blacksher, at her home in Berkeley. Defendant was Eva's youngest and favorite child.[3] She provided for him. He did no work and paid no rent. Defendant was very controlling with his mother. He demanded that his siblings not visit the home, insisting he could take care of everything on his own.

In 1990, however, as Eva grew ill, defendant's sister, Versenia Lee, began caring for her. Versenia moved into the home with her ex-husband, Sammie, and their son, Torey. To make room for them, defendant moved into a small cottage behind the house. Defendant became jealous as Eva's attention shifted away from him and towards Torey.

By May 1995, the relationship between the 40-year-old defendant and 21-year-old Torey became increasingly hostile. Early on the morning of May 7, 1995, defendant visited his brother, Elijah Blacksher. Defendant was angry, saying that Torey was "fucking with" him. Torey and his friends had threatened defendant and thrown rocks at his car. Torey was dishonoring Eva by selling cocaine at her home. Defendant asked Elijah to get him a gun so he could kill Torey. Elijah refused and tried to reason with defendant, explaining that Torey was part of the family. Elijah asked defendant not to return home but to spend the rest of the night at his residence. Defendant refused and left.

---

[3] Several members of the Blacksher family testified at the preliminary hearing and at trial. We refer to these witnesses by their given names to avoid confusion and repetition.

Later that same day, defendant called and revisited Elijah. On the telephone and in person he repeated his threats against Torey and said he was trying to find a gun. When Elijah could not calm defendant, Elijah drove defendant to the home of their eldest brother, James, hoping James would have better success.

There, defendant remained very angry. In front of Elijah, James, and James's wife, Frances, he paced the floor and kept repeating that he was going to kill "that punk" Torey and would also kill his sister Versenia if she got in the way. At various points, defendant threatened to "knock" Torey's "brains out" with a baseball bat and to get a gun and "shoot the place up." James urged defendant to calm down, leave Torey alone, and get some rest. When defendant refused to listen, James told him to leave. Defendant did so, saying he was going to buy a gun on the street.

The next evening, defendant and Torey argued in the driveway outside Eva's home. Versenia eventually broke up the argument and convinced Torey to come inside.

Hearing of the argument, Elijah visited defendant in the cottage. Elijah told defendant to stay away from Torey, but defendant again said he was going to get a gun and shoot Torey. Defendant said, "Man, I done thought about it and thought about it and thought about it, I'm going to kill him."

About 11:00 p.m. that evening, Versenia reported the threats to police. She told the responding officer, Officer Luis Mesones, that defendant was schizophrenic, had stopped taking his medication, and would sometimes become angry at people for no apparent reason. Because defendant was not at home at the time, Officer Mesones had Versenia sign a citizen's arrest form.

Between 1:00 and 2:00 a.m., a noise awakened Versenia. She found defendant sitting in the darkened living room with a baseball bat. He said he was

3

waiting for Torey to come home so he could kill him. Versenia again called the police, and Officer Mesones returned. When Officer Mesones asked defendant if he had threatened Torey, defendant said Torey had "disrespected my mother by bringing his friends in the house." According to the officer, defendant was somewhat incoherent and stared ahead not looking at him. Officer Mesones arrested defendant.

About 3:00 a.m., defendant called his sister, Ruth Cole, and asked her to bail him out. He repeatedly told her he wanted to kill Torey because Torey was being disrespectful towards Eva.

On the morning of May 9, 1995, Eva and Versenia went to court and obtained a temporary restraining order against defendant. After defendant was released from jail, he went to Eva's home and discovered his keys no longer worked. He confronted Eva and demanded she give him the keys. He told her to make Versenia and her family leave the house. Eva relented and gave defendant the keys. Versenia made arrangements to move by the first of the month.

Later that day, defendant visited his sister Ruth, told her he knew about the restraining order, and repeatedly said he was going to kill Torey. Ruth did not take defendant seriously, but reminded defendant that he was Torey's uncle. Ruth's husband Willie arrived, and defendant told him he was going to kill Torey. Asked why, defendant showed him a dent on his car and said that Torey had hit it with a brick. Defendant also claimed Torey and his friends had been threatening him. As defendant left Ruth's home, however, he said he was not going to kill Torey and that he did not want to "get his hands dirty."

The next day, on May 10, 1995, defendant went see to Elijah. He restated his decision to kill Torey, and said he had found someone who was willing to sell him a .357 Magnum. He did not care about the cost and had already withdrawn

4

money from the bank for the purchase. Elijah asked defendant to give him the money, but defendant refused, saying he would get the gun and hurt Torey.

Elijah called defendant the next morning, May 11, 1995, at 6:30 a.m. When defendant admitted he had a gun, Elijah begged him to stay in his cottage until he got there. Defendant hung up.

About 7:00 a.m., Eva's next-door neighbor, John Adams, saw defendant back his car down to the end of the driveway. Adams and defendant acknowledged each other and exchanged hellos. Defendant went to his mother's bedroom, where Eva was still in bed. He spoke briefly to her, and left her room. Eva heard Versenia exclaim that she had heard a gunshot and that she was going to check the house. Eva then heard a single gunshot. Eva got out of bed and saw Versenia fall to the ground, bleeding. Eva then ran outside.[4]

Adams heard the gunshots and called 911. Three other neighbors heard the gunshots as well. One neighbor saw defendant leave Eva's house "as if he was in a hurry," just after she heard the gunshots.

---

[4] By the time of trial, Eva Blacksher had been found incompetent to testify because of Alzheimer's dementia. She had testified at the preliminary hearing but, due to her memory problems, she was unable to remember her prior statements made to a police officer and in an application for the temporary restraining order. Her preliminary hearing testimony was read to the jury by a deputy district attorney. At trial, Eva's preliminary hearing testimony was impeached by Berkeley Police Inspector Alan Bierce, who had interviewed Eva the day after the murders. In Eva's statements to Inspector Bierce, she described hearing two gunshots soon after defendant had left her room. Eva then saw Versenia enter the hallway and face the dining room, where Torey had been sleeping. Eva heard Versenia ask someone, "What are you doing?" or "What is wrong with you?" just before hearing the third shot and seeing Versenia fall to the ground.

5

Torey died of a gunshot wound to the back of his head. A second bullet had missed Torey's head and passed through a nearby pillow.[5] Versenia died of a gunshot wound to the right side of her head. Apparently, the bullet initially passed through her right index finger. The bullets were fired by the same gun, either a .357 Magnum or a .38 Special revolver.

About 7:40 a.m., defendant called James's home and spoke with his wife Frances. Defendant nervously told her that he had heard gunshots at his mother's house and said someone should check on Eva. Frances suggested he should do so, but defendant said he did not want to be a witness to whatever happened. About 7:45 a.m., defendant called his sister Ruth and told her he had heard gunshots and screaming at his mother's house. He claimed he saw two masked men on the front porch, and asked Ruth to call the police. She asked why he did not do so. Defendant said he was afraid they would question him. He claimed he was calling from a friend's house but would not identify the friend.

Later in the day, defendant went to a travel agency, bought a bus ticket to Reno, and booked a room at a hotel casino. He made the reservations using Ruth's address. The bus left at 12:55 p.m. that afternoon.

Nearly 38 hours later, about 2:30 a.m. on May 13, 1995, defendant surrendered to Officer Martin Heist as he was sitting in his patrol car outside the Berkeley police station. Defendant was carrying toiletries and wore a T-shirt that read, "Reno, Nevada."

---

[5] Toxicology tests showed that Torey had traces of morphine, codeine, cocaine, and methamphetamine in his bloodstream and three bundles of rock cocaine in one of his socks.

6

## 2. *Defense case*

The defense played the recording of Adams's 911 call. During that call Adams said he believed defendant suffered from mental illness.

The defense also presented evidence that, during the 1980's, the Social Security Administration found defendant eligible for benefits based on paranoid schizophrenia.

A clinical psychologist, Gerald Davenport, examined defendant to determine his competence to stand trial in both 1984 and in 1996.[6] In 1984, he diagnosed defendant as a paranoid schizophrenic in remission, but found him competent. In 1996, he did not formally diagnose defendant but, based on an interview, Dr. Davenport believed that defendant was still suffering from schizophrenia. Defendant appeared hyperactive, suspicious, and overly boisterous, used "bizarre verbiage," and was inappropriately "euphoric" at times. He behaved as if he were hearing voices, although he denied experiencing hallucinations.

Dr. Davenport also recounted defendant's history of mental illness. Between 1975 and 1986, defendant was hospitalized at least five times due to suicidal thoughts, schizophrenia, psychotic depression, paranoia, and religious delusions. Between 1986 and 1996, he received mental health treatment at least eight different times. Medical records showed defendant had been repeatedly diagnosed as having paranoid schizophrenia.

Defendant was convicted as charged and the trial moved to the sanity phase.

---

[6] The trial court instructed the jury that Dr. Davenport's testimony was admitted only to impeach the testimony of several of defendant's family members who had claimed they were unaware that defendant suffered from mental illness.

**B. Sanity Phase**

    *1. Defense case*

Defendant's juvenile delinquency history began with a burglary at the age of eight. Between the ages of nine and 17, defendant committed at least 13 different offenses, including malicious mischief, extortion, burglary, theft, and robbery. He was confined to the California Youth Authority intermittently during his teenage years. Following his last juvenile offense, the court referred defendant for a 90-day psychiatric evaluation. His IQ tested in the low-normal range. An earlier IQ test, subsequently criticized for racial bias, yielded a score in the retarded range. Defendant admitted using drugs, including heroin, LSD, methamphetamine, and barbiturates beginning at the age of 16.

He was hospitalized for the first time at the age of 21 in 1975. His probation officer reported that he was depressed with suicidal thoughts. When admitted to Napa State Hospital, he was described as being in a "confused, disorganized, agitated state as a result of recent drinking." He was discharged after three days.

In December 1977, defendant was hospitalized at Highland Hospital. The mental health unit at the county jail reported he had complained of hearing voices and seeing a small man sitting on his bed. Defendant told his treating clinician that he resented his father for ignoring him during childhood. The clinician did not believe defendant was schizophrenic, but thought he was suffering from a psychotic reaction to alcohol abuse.

Just over a week later, defendant was again hospitalized, claiming he heard voices, had hallucinations of a little man criticizing him, and felt suicidal. He claimed he had been seeing the little man for two years and the hallucinations were becoming so severe that he did not feel like living any more. Defendant reported

8

consuming a pint of scotch daily in the months before his incarceration. He also claimed two incidents of untreated head trauma during his childhood, one of which resulted in a day of nausea and vomiting. Defendant was diagnosed with psychotic depressive reaction, received the antipsychotic drug Mellaril, and released five days later.[7]

Throughout 1978, defendant remained in jail but continued to have follow-up examinations by mental health specialists. One of these specialists, Sophia Miles, noted that defendant continued to be depressed but was slowly improving. She diagnosed a depressive reaction with alcohol abuse and maintained him on Mellaril.

Upon release defendant stopped taking his medication. On November 30, 1979, he was referred to Highland Hospital for a 72-hour involuntary commitment. He had stopped taking Mellaril and had become "acutely psychotic," with "auditory hallucinations [and] alterations in visual perception." He held the paranoid belief that people were trying to kill him. The treating physician at the hospital diagnosed a resurgence of schizophrenia. Defendant was injected with antipsychotic medication, improved, and was released.

On March 28, 1980, defendant was recommitted for 12 days. His treating physicians described him as suffering from auditory hallucinations, with thought

---

[7] Ruth Gades was a licensed social worker who treated defendant during this time. She testified during the sanity phase that, in retrospect, she was skeptical of defendant's claims of seeing a little man. She had never seen any of her other patients describe that kind of hallucination. Based on her subsequent experience in treating inmates, Gades believed that defendant could have manipulated his caregivers in order to be admitted to a mental health facility. Gades also believed that defendant's hallucinations were not the result of schizophrenia but were from "alcohol psychosis" due to the lingering effects of chronic alcohol abuse on the brain.

interruptions most likely stemming from the high-pitched voices he heard.  While hospitalized, defendant appeared depressed and suicidal.  Again diagnosed with psychotic depressive reaction, defendant was given Mellaril, and released.  In follow-up visits, defendant appeared to be taking his medications and was no longer psychotic.  In June 1981, defendant attempted suicide by overdosing on sleeping pills.

In August 1981, defendant was again incarcerated.  While in custody he was committed for a mental health evaluation and treatment.  He complained that his incarceration had prevented him from taking his medications and that he again heard voices.  His treating physician saw no direct signs of hallucinations.  He diagnosed a major depressive disorder with psychotic features and antisocial traits, and represcribed Mellaril, which was later changed to another antipsychotic, Thorazine.  Sophia Miles, who saw defendant on his follow-up visits, described defendant as depressed, but not psychotic or out of touch with reality.[8]

On June 18, 1984, defendant's future wife brought him to the hospital because he had not slept for five days and was preoccupied with religion.[9] Defendant arrived holding his girlfriend with one hand and clutching a Bible in the other, claiming that certain Bible passages referred directly to him.  He was given Mellaril and discharged, but committed the next day having overdosed on the

---

[8]     Miles testified that if defendant were actually suffering from schizophrenia, any prolonged period without medication would most likely result in his hospitalization because his illness would easily draw the attention of others.

[9]     Defendant was married twice, had a son with his second wife in 1985, and two more sons with other women in 1988 and 1994.  The prosecution elicited testimony from Dr. Pierce that defendant reportedly had been violent towards his ex-wives during their relationships.

10

Mellaril. Medical records described defendant as depressed, paranoid, mumbling incoherently, and pacing. He was discharged on June 25, 1984.

On August 2, 1984, defendant was yet again committed after his mother and sister-in-law reported that he appeared to hear voices, was paranoid and agitated, talked incoherently, and appeared disoriented. Straight-jacketed and given Mellaril, defendant calmed down enough to be sent home. His fiancée's mother strongly protested his release.

In October 1984, defendant again began acting strangely. His family persuaded his parole officer to return defendant to jail so he could receive treatment. A jail therapist evaluated defendant and had him committed because he was paranoid, expressed a preoccupation with sex and religion, and appeared to be having auditory and visual hallucinations. Defendant was released after 35 days. During his stay, he was slow to improve. He complained of hallucinations and said "men and women had been entering his body through suction." His treating physicians tried various psychotropic medications. Defendant responded somewhat to Mellaril and lithium, which is used to treat mania. Defendant's discharge diagnosis was bipolar disorder with psychotic features.

In 1985, defendant was moved to the California Medical Facility at Vacaville. Before his scheduled release in the summer of 1986, the Board of Prison Terms ordered a mental health evaluation. Defendant was diagnosed as schizophrenic, with paranoid features in remission, and with mixed substance abuse and antisocial personality disorder. The report noted that defendant did not appear psychotic in interviews but did choose his words carefully and sometimes laughed and smiled inappropriately, as if responding to internal stimuli. While in prison, defendant was unable to hold a job due to "bizarre" behavior. The report predicted that defendant would likely deteriorate upon release.

11

On October 6, 1986, defendant's parole officer had him committed because defendant declared he was a woman. He had insisted on using the women's bathroom at church and claimed he had been mistakenly raised as a man. He objected to being addressed as "sir," and made frequent religious references. He denied hallucinations, but laughed inappropriately as if responding to internal stimuli. Defendant was forcibly injected with Haldol, a potent antipsychotic medication. Defendant did not appear to be a threat to himself or others, but the medication did not alleviate defendant's delusion that he was a woman. Against the advice of his treating physician, defendant discharged himself at the end of the 72 hours and balked at the idea of taking any medication. Defendant was diagnosed as having chronic and delusional paranoid schizophrenia.

From 1987 to 1988, defendant was again incarcerated at the California Medical Facility at Vacaville. There, he claimed he was homosexual and insisted he be housed only with other gay inmates in administrative segregation. He refused to take his medication. Staff and fellow inmates reported that defendant was paranoid, and sometimes incoherent, and would yell and laugh inappropriately. He was given the probable diagnosis of paranoid schizophrenia.

Defendant had no further mental health institutionalizations after January 21, 1988, but continued to receive disability payments for mental illness until his arrest for the present offenses. Defendant's girlfriend said defendant continued to suffer delusions after his release from incarceration in the early 1990's. Defendant at various times believed he had two heads or the head of a dog, thought people looked like devils, believed he was Jesus and his mother was "the Earth Mother," and was convinced he was the only man with male genitalia.

Dr. Michael Levin, who had diagnosed defendant with paranoid schizophrenia in 1986, testified that schizophrenia is a severe, lifelong mental

illness in which a person's "internal psychiatric or psychic life" becomes more real and important to him than the outside world. It impairs his ability to assess reality. A schizophrenic will often stare off into space or laugh inappropriately, because he is responding to internal stimuli or hallucinations. Some patients with milder symptoms are able to function well if medicated. Nonmedicated schizophrenics may remain "out of trouble" because they are withdrawn and keep to themselves. Schizophrenics commonly do not recognize themselves as mentally ill.

Dr. William Pierce testified that during a psychotic episode a schizophrenic would be extremely impulsive and would respond to internal stimuli. The person would be in a manic state and nonresponsive to external reality. A psychotic episode would disrupt the person's cognitive functions and severely affect the ability to concentrate, anticipate, and plan.

Based upon defendant's mental health records, interviews of defendant's friends and family, prior competency examinations, [10] and his own 1995 and 1997 examinations of defendant, Dr. Pierce believed defendant suffered from paranoid schizophrenia. During interviews, defendant was rambling and incoherent, with tangential and disordered thinking. Defendant launched into grandiose rants about Moses, Ali Baba and the 40 thieves, Africa and the Middle East. He claimed he knew Alexander the Great and was related to Caesar and Cleopatra. According to Dr. Pierce, during testing defendant appeared internally preoccupied when directed to perform certain tasks. Dr. Pierce believed defendant had a poor ability to control a "vivid fantasy life" and that he would have difficulty separating his internal experiences from external reality. Based on Officer Mesones's description

_____

[10] The defense also introduced evidence of defendant's 1996 competency examinations. (See *post*, at p. 61.)

13

of defendant on May 8, 1995 as he waited in his mother's living room with a baseball bat, Dr. Pierce believed defendant was having a psychotic episode. In his opinion that incident alone would have justified an involuntary mental health commitment.

But Dr. Pierce could not state with confidence whether defendant was having a psychotic episode at the time of the murders. In fact, he stated defendant probably could have distinguished between right and wrong before the murders given that, at one point, he told his sister Ruth he was not going to "get his hands dirty" by killing Torey. Dr. Pierce also acknowledged there was no overt evidence that defendant was suffering from hallucinations around the time of the murders. His efforts to conceal the crime and flee to Reno showed his cognitive functions were not completely impaired.

### 2. *Prosecution's case*

To rebut the defense's claim of insanity, the prosecution presented the testimony of defendant's older siblings, his statements to police, and the testimony of law enforcement personnel who had observed defendant after his incarceration for these offenses.

Defendant's elder brother, Artis Blacksher, Jr., testified defendant was his mother's favorite child. Their father was a strict disciplinarian who beat the children when they misbehaved. Their parents prohibited fighting and taught them to obey rules.

As defendant grew into an adult, both Artis and his sister Ruth said defendant mocked the idea of working for a living. Defendant told his siblings that working was not his "thing" and that he was going to "beat the system."

14

Defendant repeatedly rejected his siblings' attempts to encourage him to find work.[11]

Artis, who moved out of the family household when defendant was five years old, was unaware that defendant was ever hospitalized. He knew of no other family members who ever required psychiatric care.

About a month after the murders, defendant wrote a letter to his mother, referring to Torey, not by name, but as "the punk." Defendant also wrote several letters to Ruth in which he made numerous religious references.

Two days after the murders, defendant was interrogated by Deputy District Attorney Richard Moore and Berkeley Police Investigator Douglass Wright. In the tapes of that interview, defendant claimed he walked out of his cottage on the morning of the murders, backed his car down the driveway, and exchanged pleasantries with his neighbor. He went inside the house, spoke to his mother briefly, and saw Torey asleep and Versenia lying in bed. After using the bathroom, he left through the front door and discovered two masked men on the front porch. They motioned for him to leave. He did not see any weapons, but they carried themselves as if they were armed. As defendant got into his car, he saw the men enter his mother's home then heard what sounded like gunshots. He thought the men were there for Torey and believed they would leave his mother and sister alone if he did not interfere or try to call the police. He acknowledged he called his sister Ruth to report what had happened and later went to a restaurant for breakfast. He decided to leave town because he did not want to be involved with the police. He eventually went to Reno because he did not want to face the

---

**11**     Defendant's employment history was meager, but records indicated he briefly worked as a cook in 1984.

reality that something may have happened to his mother. His clothes were worn, so he left them in his hotel room and bought new ones. Defendant claimed Torey was his favorite nephew, but admitted having problems with him in the days before the murders. He repeatedly denied telling family members he wanted to kill Torey, but admitted saying he wanted to hurt him. Defendant also denied having any mental problems.

According to law enforcement personnel, during his incarceration for the present offenses, defendant never reported any mental illness or hallucinations, and was on no medication. He did, however, insist that he was homosexual. Jail officials later removed him from administrative segregation, over his protest, believing there was no basis for his claim. One deputy sheriff described defendant as having "temper tantrums." According to the deputy, he saw defendant scream and yell at people a few times without apparent provocation. Once, defendant began screaming and banging his cell door for no apparent reason.

The jury rejected defendant's insanity claim and the penalty phase began.

## C. Penalty Phase

### 1. Prosecution's case

#### a. Defendant's prior violent offenses

On October 10, 1984, defendant, while waiting in a holding cell, was agitated and pacing, making comments about "whitey." He assaulted two White inmates in the holding cell, hitting one of them on the back of the head and punching the other inmate in the face, causing profuse bleeding.

On January 25, 1988, at the California Medical Facility at Vacaville, defendant punched another inmate in the face after an argument in the shower. The inmate was knocked to the ground and suffered swelling around the eye.

16

On January 5, 1989, defendant threatened his father with a butcher knife during an argument about defendant's failure to pay rent. The father, who was terminally ill with stomach cancer, was nervous and shaking. When defendant refused to put down the knife, Eva and defendant's sister, Ruth, shielded the father and took him to another room. As his mother guarded the other side of the door, defendant repeatedly hit the door frame with the knife, threatening to kill his mother if she did not get out of his way. When the police arrived, the father declined to have defendant arrested.

On February 17, 1990, while Ruth and Artis were visiting their mother, defendant complained about Artis's presence. When Artis refused to leave, defendant picked up a butcher knife and began pacing and complaining about his brother's presence. Artis kept defendant at bay with a chair and umbrella, while Ruth and Eva tried to convince him to put down the knife. Eva called the police, but defendant left just before they arrived. Later that day, defendant returned and told his mother that she had to choose between him or his siblings. He told Ruth and Artis that he did not want them coming to the house anymore.

On July 10, 1991, defendant created a disturbance on a bus. The driver contacted the police to have him removed. As a deputy sheriff began to escort him off the bus, defendant walked down the aisle and punched a teenage boy in the face.

On April 16, 1995, defendant picked up his girlfriend, LaDonna T., at the airport, and drove her to his cottage instead of her residence as she had requested. As LaDonna sat on defendant's bed, he suddenly jumped on her and punched her in the face. Defendant continued to punch her, and kicked her after she fell to the floor. Defendant accused LaDonna of having an affair while she was gone. Torey came to the door and yelled at defendant to leave her alone, but defendant told

17

Torey to mind his own business. Defendant ordered LaDonna to take off her clothes and raped her. Afterwards, defendant took her home and acted as if nothing had happened. Fearful, LaDonna did not report the rape, but discontinued their relationship. LaDonna testified defendant had an erratic personality and would sometimes swear at strangers in public. Defendant once claimed he saw a man with four legs sitting outside a restaurant.

The parties stipulated that defendant had been convicted of seven prior felonies, including five burglaries, an assault, and possessing narcotics for sale.

### b. Victim impact testimony

Ruth last spoke with her sister Versenia two days before her murder. Versenia was crying because Eva had let defendant back in the house. Ruth was unable to console Versenia because defendant was in Ruth's house during the phone call. Ruth deeply regretted her inablity to comfort her sister during their last conversation. Ruth was "devastated" by the loss of her sister and nephew. She described panicking when seeing all the bloodstains on the floor and furniture in her mother's home. She had difficulty accepting that her sister and nephew were dead until she saw their bodies at the mortuary. She spent $8,000 on funeral expenses.

Ruth also described her mother's reaction to the murders. Eva cried constantly over the loss of her daughter and grandson. Ruth frequently took her mother to visit their graves, which seemed to give her some relief. Eva repeatedly asked why defendant killed them.

18

Sammie Lee, Torey's father and Versenia's ex-husband,[12] said he "went off" when he discovered that they were dead. Sammie was in disbelief and had difficulty concentrating at work. For a time he stayed at Ruth's home, but decided that staying at Eva's home would help him get over his feelings. Once there, surrounded by pictures of Torey and Versenia, he could not sleep, and began drinking heavily. Sammie eventually lost his job, and Ruth urged him to seek help.

Artis said he felt like he had been "run over by a train" when he learned that his sister and nephew were dead. He tried unsuccessfully to find and hurt defendant after the murders.

The prosecution also displayed the clothes Torey and Versenia wore at the time of their murders.

2. *Defense case*

Defendant's brother Elijah, sister Georgia Hill, Georgia's ex-husband Ronald Hill, and Versenia's ex-husband Robert Ruffin[13] testified as to defendant's family history and character.

Defendant's father was an alcoholic and often absent. He abused his wife and was frequently unfaithful. Defendant would sometimes try to stop his father from striking his mother. The father had a reputation for wielding a knife during arguments.

Defendant's mother was protective of defendant because he was the youngest child and had mental problems. As a child, defendant was obese and

---

[12] Versenia and Sammie had divorced in 1987. Versenia's second marriage also ended in divorce. By the time of the murders, Sammie and Versenia had reunited, were living together, and intended to remarry.

[13] Robert Ruffin was married briefly to Versenia in 1992. During that time, he was a frequent visitor to Eva's home and saw defendant often.

19

often teased. At school, he would do peculiar things like get lost or wander into the girls' bathroom. He would often talk to himself, and was sometimes difficult to converse with. His mind wandered and he seemed distant.

Defendant was repeatedly fired from jobs because he would wander off. He was fired as a cook because he let a pan catch on fire and simply laughed as it burned. Defendant's behavior became more unusual after he saw his cousin Floyd shot to death by police. Defendant subsequently began hallucinating, laughing out loud without reason, and offering his own bizarre interpretations of the Bible.

Other family members suffered from alcoholism and mental illness. An aunt committed suicide; a cousin attempted suicide; a niece had signs of mental illness.

Defendant's siblings were deeply divided. Older siblings, Ruth, Artis, and James, were fairly uninvolved in the upbringing of their younger siblings, having moved from the household to start their own families.[14] Defendant's mother added defendant's name to the deed of her home and named him a beneficiary in her will because she wanted to provide for him in case something happened to her. The older siblings were jealous of the attention and support his mother gave defendant. They refused to believe he had any disabilities. The younger siblings, however, expressed compassion for defendant, and believed he suffered from a mental disability. Georgia and Elijah thought that the older siblings stood to gain from defendant's death by inheriting their mother's assets and that they were "in denial" about the problem of mental illness in the family.

---

[14] Another sibling, Ruby Lindsey, lived in Texas and had little involvement in any of the family disputes.

20

Defendant got along well with Elijah's family. He was close to Elijah's children and to his sister Versenia. He was also very involved in the life of his youngest child and tried to be a good father to him. Elijah and Georgia's ex-husband Ronald Hill were surprised that he hurt Versenia and expressed doubt that he actually killed her. Elijah, Georgia, and Ronald all believed defendant should not be put to death because of his mental problems.

Friends of the Blacksher family also testified on defendant's behalf. Many had frequently observed defendant talking to himself, making abrupt changes in topics of conversation, and staring off into space.

Longtime family friend Alisa Nelson, a former peace officer and an associate governmental analyst with the California Department of Alcohol and Drug Programs, believed defendant suffered from a mental disorder. Nelson saw defendant pace and talk to himself. Sometimes he would quote from the Bible inaccurately. On one occasion, defendant glared at her and verbally abused her for no apparent reason. When she asked him what he was doing, defendant "snapped out of it," as if he suddenly realized he had been talking to the wrong person, and walked away.

Eva's neighbor, Diane Marks, knew defendant well, and he always treated her with respect, frequently cared for her dog, and offered to help with her yardwork. Eva once told Marks that defendant could become angry if he did not take his medication.

According to Clarence Burrell, a former San Quentin correctional officer and a friend of defendant's sister Georgia, defendant appeared to be living in the past and kept a 1960's hairstyle. Once, defendant professed that either he was "crazy" or "the world's crazy."

21

Patricia White-Brown, the mother of defendant's ex-girlfriend Tracy and the grandmother of defendant's youngest son, said she never noticed anything unusual about defendant's behavior. Defendant was respectful to her and worked hard to help get her daughter off drugs. White-Brown thought defendant was a good father.

Alisa Nelson, Diane Marks, and Patricia White-Brown all said they were against capital punishment. Marks and White-Brown believed defendant did not deserve to die because he was a good person. Nelson thought defendant should live because he had a son. He was mentally ill, and the family had already suffered enough tragedy.

## II. PRETRIAL ISSUES

### A. Defendant's Competency to Stand Trial

Defendant claims he was denied federal due process of law because he was incompetent to stand trial. He contends the court abandoned the duty to exercise its discretion by appointing and relying on a "tie-breaking" third expert when the first two experts disagreed as to defendant's competency. He further argues the court abused its discretion by relying on the allegedly insufficient examinations of the two experts who concluded defendant was competent. We find no abuse of discretion and no error in the competency determination.

#### 1. The Competency Proceedings

On April 19, 1996, defense counsel declared a doubt as to defendant's competence to stand trial. Under sections 1367 and 1368, the court suspended proceedings and appointed Psychologist Gerald Davenport and Psychiatrist Joel Fort to examine defendant. They submitted conflicting reports.

Dr. Davenport found defendant incompetent to stand trial, but believed he could regain competence through medication and psychological treatment. During

22

his interview, defendant "talked non-stop for approximately an hour and fifteen minutes." Although defendant initially presented "a logical thought process," his "thought confusion" gradually revealed itself. Defendant appeared suspicious and had "severe mood swings" throughout the interview. At times, he appeared "anxious and depressed," while at other times he appeared "euphoric and laugh[ed] wildly" for no apparent reason. Although defendant denied any hallucinations, "he clearly was responding to internal stimuli." He spoke loudly, repeated himself, could not sit still, had "delusions of persecution," engaged in loose and tangential thinking, and used bizarre verbiage. Defendant occasionally could think abstractly, "but unfortunately would very quickly become overly involved in his thought process," "lose his focus," and use strange words. Defendant's presentation was "so severe" that Dr. Davenport questioned whether he was malingering, and asked to review his mental health records. According to Dr. Davenport, those records showed that defendant had received "very little intervention over time." Although defendant appeared to understand the charges against him and the roles of the participants in the courtroom, Dr. Davenport believed he was not capable of assisting in his own defense.

Dr. Fort concluded defendant was competent to stand trial. He reviewed defendant's background information, including the circumstances of these offenses and his mental health history. During defendant's interview, he was "cooperative, talkative, oriented," and appeared to have "average intelligence and memory." Dr. Fort reported defendant understood the charges against him, the roles of the participants at trial, and the purpose of his next court appearance. Dr. Fort also noted defendant was able to summarize the testimony of three witnesses, and was able to read and approve a lengthy motion. Dr. Fort noticed no signs of hallucinations or delusions except that defendant claimed he did not exist anymore

23

because he "died in 1984 and someone else took control." Dr. Fort did not believe this delusion affected defendant's mental state or was related to the crimes.

Noting that the doctors' reports were "at opposite ends of the opinion scale," on May 23, 1996, the court appointed a psychiatrist, Dr. Fred Rosenthal, to conduct a third competency examination.

Dr. Rosenthal found defendant competent. He described defendant as "calm and in control" during his interview, although he was "somewhat rambling," exhibited "indications of paranoid thoughts" about his case, and had "a somewhat distorted, self-justifying attitude about his current problems." Defendant "seemed to maintain his hold on reality to some extent," and there were no indications he was suffering from any hallucinations or any other severe cognitive deficits. Based on defendant's interview and mental health history, Dr. Rosenthal believed defendant suffered from chronic paranoid schizophrenia and was in denial about his mental disorder. Dr. Rosenthal reported that defendant was able to understand the charges against him and discuss his legal situation in a "coherent" and "fairly reasonable manner," except when he professed his innocence and exhibited paranoid thoughts about being falsely accused and victimized by the justice system. Dr. Rosenthal reported that defendant was willing to cooperate and work with his attorney "because he agreed with him on his innocence."

On July 3, 1996, the parties submitted the issue of defendant's competency on Dr. Rosenthal's report. The court found defendant competent "[b]ased upon the contents of the report" and reinstituted the criminal proceedings.

### 2. Analysis

"The criminal trial of a mentally incompetent person violates due process. (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354.) However, a defendant is not incompetent if he can understand the nature of the legal proceedings and assist

24

counsel in conducting a defense in a rational manner. (See *ibid.*; § 1367.)" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1047.) A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence by the party contending he or she is incompetent. (§ 1369, subd. (f); *Medina v. California* (1992) 505 U.S. 437; *People v. Medina* (1990) 51 Cal.3d 870, 881-885; Cal. Rules of Court, rule 4.130(e)(2).) In reviewing on appeal a finding of competency, "an appellate court must view the record in the light most favorable to the verdict and uphold the verdict if it is supported by substantial evidence." (*People v. Marshall* (1997) 15 Cal.4th 1, 31.)

Defendant argues the court's reliance on Dr. Rosenthal's report was an abuse of discretion because the report did not provide substantial evidence of his competence. Specifically, he argues Dr. Rosenthal's report only established that defendant was *willing* to cooperate with his attorney, but failed to establish that defendant was *able* to assist his defense counsel in a rational manner. In fact, he asserts, the report noted he became irrational, paranoid, and had a limited "hold on reality" when it came to questions of his innocence.

Because defendant failed to raise these objections below, they are forfeited. Defendant argues the application of the forfeiture rule here "is akin to arguing that a failure to object to evidence on hearsay grounds would prevent an argument on appeal that the evidence was constitutionally insufficient to support the verdict." Defendant ignores a crucial distinction. Unlike the adjudication of criminal guilt, which presumes a defendant's innocence and places the burden of proof on the state, here defendant is presumed competent. Because he raised the issue of his competency, he assumes the burden of proof. (§§ 1096, 1369, subd. (f).) Under these circumstances, by failing to object below, defendant deprived the prosecution of the opportunity to rebut any objections with evidence supporting the

25

presumption of competency. (See *In re Seaton* (2004) 34 Cal.4th 193, 199; see also *People v. Weaver* (2001) 26 Cal.4th 876, 904 ["Having submitted the competency determination on the two psychiatric reports, defendant may not now relitigate that question with arguments he did not make below"].) Because defendant submitted the question of his competency on Dr. Rosenthal's report, he has forfeited the claims that the court abused its discretion by determining competency on the "majority vote" of the experts or by relying on allegedly insufficient reports.

In any event, there is no merit to defendant's claim that the court failed to exercise its discretion by relying on the "majority vote" of the three appointed experts. Instead, the record demonstrates that the parties agreed to submit the issue of defendant's competency on Dr. Rosenthal's report and the trial court made its ruling based on that report. The court's decision to obtain a third report and its reliance on that single report was not an abuse of discretion. (See *People v. McPeters* (1992) 2 Cal.4th 1148, 1168-1169; § 1369, subd. (a).)

Moreover, it was defendant's burden to prove he was legally incompetent, and Dr. Rosenthal's report does not support such a determination. Although Dr. Rosenthal believed defendant suffered from paranoid schizophrenia, he concluded defendant remained "sufficiently in contact with reality to be considered mentally competent to stand trial." He based this conclusion on an examination of defendant and consideration of his prior mental health history. Although Dr. Rosenthal did not state in so many words that defendant was *capable* of assisting in his defense, that conclusion was evident in his report. Dr. Rosenthal concluded defendant understood the charges against him, was able to discuss his legal situation coherently, and was willing to cooperate with his attorney. These circumstances demonstrated that defendant was capable of assisting in his defense.

26

An insistence upon innocence is not unknown among those accused of crime. That was the position defendant consistently maintained following the murders. Indeed, his steadfast contention that two masked men were responsible reflected an ability to formulate a defense to the charges against him. In the end, nothing in Dr. Rosenthal's report established as a matter of law that defendant was incompetent.[15]

## B. Defendant's Absence from Certain Proceedings

Defendant contends the court violated his constitutional and statutory rights by conducting proceedings in his absence on 17 different occasions. "A criminal defendant's right to be personally present at trial is guaranteed under the federal Constitution by the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment. It is also required by section 15 of article I of the California Constitution and by sections 977 and 1043."[16] (*People v. Concepcion* (2008) 45 Cal.4th 77, 81.) "Under the Sixth Amendment, a defendant

---

[15] Moreover, although Dr. Davenport deemed defendant incompetent, his opinion was initially tempered by a belief that defendant may have been malingering. He also found defendant able to understand the charges against him and the roles of the participants in the courtroom. Dr. Fort's report further supported the finding of competence. According to Dr. Fort, defendant understood the proceedings against him and the rulings in the case, understood and approved of a motion filed in the case, and was able to summarize the testimony of witnesses. On this record, we find neither error nor prejudice.

[16] Under section 977, subdivision (b)(1), a felony defendant "shall be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence," and "shall" also attend "all other proceedings," unless he or she executes a written waiver of the right to be present "in open court." Section 1043, subdivision (a), states in part that, "Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial."

has the right to be personally present at any proceeding in which his appearance is necessary to prevent 'interference with [his] opportunity for effective cross-examination.' " (*People v. Butler* (2009) 46 Cal.4th 847, 861, quoting *Kentucky v. Stincer* (1987) 482 U.S. 730, 744–745, fn. 17.) "Due process guarantees the right to be present at any 'stage … that is critical to [the] outcome' and where the defendant's 'presence would contribute to the fairness of the procedure.' " (*Butler*, at p. 861, quoting *Stincer*, at p. 745.) " 'The state constitutional right to be present at trial is generally coextensive with the federal due process right. [Citations.]' Neither the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him. [Citations.]" (*Butler*, at p. 861, quoting *People v. Harris* (2008) 43 Cal.4th 1269, 1306.) "Defendant has the burden of demonstrating that his absence prejudiced his case or denied him a fair trial." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1357.)

In each of the 17 complained-of proceedings, defendant's presence was not necessary for effective cross-examination or to contribute to the fairness of the procedure. His absence did not deprive him of the full opportunity to defend against the charges.

Most of the complained-of proceedings require little discussion, as they involved pretrial matters or occurred before the presentation of evidence at the guilt phase. On one occasion, defendant had agreed to his absence on the record the day before, and the proceedings merely involved corrections to the jury questionnaire and the record. Two of the proceedings were postponed specifically because of defendant's absence. Nine of the proceedings concerned routine legal and procedural matters involving discovery, record corrections, stipulated juror

28

hardships, and exhibit list correction.  In one proceeding, the prosecutor and defense counsel briefly appeared to set the matter for trial, and defense counsel withdrew defendant's time waiver.  At the next appearance, defendant approved of the withdrawal on the record.  Once in midtrial, the parties discussed the guilt phase jury instructions.  Defendant fails to explain why his presence was necessary for that proceeding.  (*People v. Butler, supra*,  46 Cal.4th 847, 865 [discussion of jury instructions is not a critical stage of the proceedings requiring defendant's presence].)

Only three of defendant's absences require greater discussion.  First, during jury selection, defendant was not present at an in-chambers discussion of a defense motion made pursuant to *Batson v. Kentucky* (1986) 476 U.S. 79  (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).  The discussion was brief, and the court repeated its ruling in defendant's presence.  Defendant voiced no objection to his absence from chambers.  He fails to explain why his presence was necessary or how his absence prejudiced his case.

Second, defendant was absent when a juror was replaced during the penalty phase deliberations but defendant had been present at the prior proceeding where the parties agreed to excuse that particular juror if the deliberations had not concluded in time.  The next day, in defendant's presence, the juror was replaced with an alternate, and defendant voiced no objection.  Given these circumstances, defendant fails to explain why his presence was required.

Third, defendant was absent when the parties discussed penalty phase instructions and defense counsel withdrew defendant's request for allocution,

29

stating, "[w]e are not pursuing that."[17]  "[W]e have repeatedly held there is no right of allocution at the penalty phase of a capital trial."  (*People v. Lucero* (2000) 23 Cal.4th 692, 717.)  Therefore, even assuming defendant did wish to address the court before his sentencing, defense counsel did not violate any cognizable right by withdrawing defendant's request for allocution.

In sum, defendant fails to show how any of his absences affected his ability to defend himself or otherwise prejudiced his case.

## C. *Batson/Wheeler* Claims

Upon defendant's objection, the court found no prima facie showing that the prosecutor exercised two peremptory challenges on racial grounds.  Defendant challenges the ruling.  There was no evidence of racial bias and no error.

The prosecution's use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity, violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution and his right to equal protection under the Fourteenth Amendment to the United States Constitution.  (*Batson*, *supra*, 476 U.S. at p. 97; *Wheeler*, *supra*,  22 Cal.3d at pp. 276-277.)  These procedures apply when a defendant makes such an objection:  "First, the defendant must make out a prima facie case by 'showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'  [Citation.]  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral

---

[17]    Previously, just before the start of the penalty phase and in defendant's presence, defense counsel had mentioned his intention to make a motion "on the right of Mr. Blacksher to allocute."

justifications for the strikes.  [Citations.]  Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'  [Citation.]"  (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted; see also *People v. Lancaster* (2007) 41 Cal.4th 50, 74.)

At issue here is whether defendant made a prima facie showing of group bias.  To do so, the defendant must demonstrate " ' "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.]' " (*People v. Howard* (2008) 42 Cal.4th 1000, 1016, quoting *Johnson v. California*, *supra*, 545 U.S. 162, 168.)  Where, as here, it is unclear whether the court relied on the recently disapproved "strong likelihood" standard, rather than the correct "reasonable inference" standard, "we review the record independently" to determine whether defendant's showing met the "reasonable inference" standard.  (*Howard,* at p. 1017.)

Defendant is African-American.  During jury selection, the prosecutor used his fourth and eighth peremptory challenges to excuse Prospective Jurors M.P. and L.W., African-American women.  Defense counsel lodged an objection in chambers, arguing there was "a strong likelihood that both of those jurors were excluded on the basis of their race."  The court found no prima facie showing, noting there were still two African-American jurors on the panel and that the defense had exercised one of its own challenges against an African-American juror.  Jury selection resumed.  The final jury included six African-American jurors.

Based on our independent review, we agree with the court that defendant did not make a prima facie showing of group bias.  Defendant offered no circumstances relevant to his claim of discriminatory intent.  Defense counsel

made no attempt to argue that the excused jurors were not, apart from their race, as "heterogeneous as the community as a whole" or that the prosecution engaged them in desultory voir dire. (*People v. Bell* (2007) 40 Cal.4th 582, 597.) Defense counsel failed to show that the prosecution had struck most or all members of the identified group or had used a disproportionate number of challenges against the group. (*Ibid*.)

In fact, other circumstances demonstrate a lack of discriminatory purpose. The prosecutor did not challenge several other African-American jurors, and, as noted, six ultimately served on the jury. (*People v. Cornwell* (2005) 37 Cal.4th 50, 70 [concluding a challenge raised no inference of bias, "particularly in view of the circumstance that the other African-American juror had been passed repeatedly by the prosecutor from the beginning of voir dire and ultimately served on the jury"]; *People v. Turner* (1994) 8 Cal.4th 137, 168 ["While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection"].)

Moreover, race-neutral grounds supported the prosecutor's challenges. Prospective Juror M.P. wrote that she had "ambivalent feelings" toward the death penalty. She expressed discomfort in playing any role in deciding to impose a death sentence. She believed no one has the right to take a life and such a decision might be akin to "playing 'God.' " Prospective Juror L.W. stated in her questionnaire that she was only "moderately" in favor of the death penalty and believed a life sentence was a more severe penalty. (See *People v. Bolin* (1998) 18 Cal.4th 297, 317 [the use of "peremptory challenges to excuse prospective jurors who expressed scruples about imposing the death penalty" is proper].)

32

Furthermore, M.P. wrote that, based upon a racial-profiling incident involving her brother and the police, she might treat police testimony with skepticism. (*People v. Farnam* (2002) 28 Cal.4th 107, 138 ["a close relative's adversary contact with the criminal justice system might make a prospective juror unsympathetic to the prosecution"].) Finally, L.W. was a psychology major and characterized that discipline as a "science." Her background thus posed the danger of having her own specialized knowledge influence her decisionmaking regarding the significance of the claims of defendant's mental illness. (*People v. Howard* (1992) 1 Cal.4th 1132, 1156 [prospective juror's professional training as a nurse suggested a possible ground for the prosecutor's challenge].)

The court properly found no prima facie case of discrimination and did not err in denying defendant's *Batson/Wheeler* motion.

### III. GUILT PHASE ISSUES

### A. Admission of Eva Blacksher's Statements

Defendant contends the court erred by admitting several hearsay statements of Eva Blacksher, who was deemed incompetent to testify at trial due to dementia. The court allowed the prosecutor to present her preliminary hearing testimony under Evidence Code sections 1290 and 1291.[18] Because portions of Eva's preliminary hearing testimony were inconsistent with statements she had made

---

[18] Evidence Code section 1290 defines " 'former testimony,' " in relevant part, as "testimony given under oath in: [¶] . . . [a]nother action or in a former hearing or trial of the same action[.]" (Evid. Code, § 1290, subd. (a).)

Evidence Code section 1291 is the hearsay exception allowing a party to admit against the opposing party the former testimony of an unavailable declarant, provided that the opposing party "had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a)(2).)

33

before that hearing, the court also allowed the prosecution to present several of her previous statements. Defendant lodged hearsay and confrontation clause objections to most of these statements below, and renews these objections on appeal. He now also argues that some of these statements were inadmissible under the subsequent rule of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). In *Crawford*, the high court held that the Sixth Amendment's confrontation clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford*, *supra*, 541 U.S. at pp. 53-54.)

Eva's statements fall under three broad categories: 1) statements she made in relation to the restraining order she obtained against defendant two days before the murders; 2) statements she made to a police officer and family members soon after the murders; and 3) statements she made to a detective the day after the murders. All of the challenged statements were properly admitted.

### 1. Statements concerning the restraining order

#### a) Background

In the preliminary hearing transcript read to the jury, Eva denied obtaining a temporary restraining order against defendant. She could not remember signing an application for the order and denied writing that she was afraid of defendant. She also denied knowing that defendant and Versenia had any problems before the murders.

Eva's daughter, Ruth Cole, testified at trial about statements Eva and Versenia made on their way to court to obtain the restraining order. As Ruth drove Eva and Versenia to the courthouse, they discussed how defendant's appearance with a baseball bat the night before had made them fearful. Ruth described how

34

Versenia and Eva spent hours at the courthouse waiting in line and filling out forms. Ruth saw Versenia read the application forms to Eva and fill them out, saw Eva sign them, and then saw them submit the forms to the court clerk. Ruth recognized Versenia's handwriting and her mother's signatures on the forms.

During the course of Ruth's testimony, defense counsel objected to several questions regarding whether Eva knowingly and willingly went to the courthouse to obtain the order, claiming the questions called for speculation and a conclusion as to Eva's mental state. Defense counsel also made a general objection to Eva's statements to Ruth on confrontation grounds. The prosecution argued that Ruth's testimony was admissible to show that Eva feared defendant and to impeach Eva's preliminary hearing testimony in which she either denied or could not remember being involved in the application for the restraining order against defendant. The court overruled the defense objections, initially ruling the statements were admissible as prior inconsistent statements[19] and to show Eva's state of mind.[20] Later, however, the court questioned whether Eva's state of mind was relevant

[19] Evidence Code section 1235 states: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Evidence Code section 770 states, in relevant part: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] . . . [t]he witness was so examined while testifying as to give him an opportunity to explain or to deny the statement[.]" (Evid. Code, § 770, subd. (a).)

[20] Evidence Code section 1250 states, in relevant part: "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] . . . [t]he evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action[.]" (Evid. Code, § 1250, subd. (a).)

and, instead, instructed the jury that Eva's statements to Ruth about obtaining the restraining order were admissible only to impeach Eva's prior testimony "and for that purpose only." In light of this clarification and instruction by the trial court, we review the question of whether the statements were properly admitted for impeachment.

Defendant here repeats the objections he made below. He also argues that Ruth's testimony was inadmissible to impeach Eva's preliminary hearing testimony because, under *Crawford*, Eva's failing memory effectively denied him his right to cross-examine her at the preliminary hearing. He claims her preliminary hearing testimony revealed she was often unable to understand questions posed to her and to remember relevant details, thereby preventing him from engaging her in any meaningful cross-examination.

First, we deal with defendant's contention that Ruth's testimony impeaching Eva's former testimony should not have been admitted because defendant was denied his right to effectively cross-examine Eva at the preliminary hearing. Then, we will address defendant's additional arguments that, notwithstanding any defects at the preliminary hearing, Ruth's testimony impeaching Eva was not admissible under the confrontation clause and that her testimony constituted improper opinion evidence as to Eva's mental state.

b) *The Right to Cross-Examination at the Preliminary Hearing*

Concerning any defects at the preliminary hearing, we note that defendant did not challenge Eva's competence at the preliminary hearing. Further, at trial, he made no objection to the admission of Eva's preliminary hearing testimony. Although the high court's decision in *Crawford* came well after the proceedings in this case, our statutory law governing the admission of former testimony has long required the prior opportunity to cross-examine as a foundational prerequisite

36

under Evidence Code section 1291, subdivision (a)(2). Consequently, defendant has forfeited any claim that Eva's preliminary hearing testimony was inadmissible. He twice failed to urge that Eva's mental state precluded a meaningful opportunity for cross-examination.

The claim also lacks merit. The fact that, at the preliminary hearing, Eva had some difficulty initially understanding the questions posed to her or remembering some of her previous statements did not render defendant's cross-examination opportunity meaningless. "The right of confrontation does not protect against 'testimony that is marred by forgetfulness, confusion, or evasion.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 742, quoting *Delaware v. Fensterer* (1985) 474 U.S. 15, 22; see also *United States v. Owens* (1988) 484 U.S. 554, 560.) To be sure, Eva expressed some minor confusion, but she was able to respond to the questions posed and rephrased to her and was otherwise lucid. Nothing in her testimony revealed "an inability to distinguish truth from falsehood (or perception from imagination)" or a failure to appreciate her "obligation as a witness to tell the truth." (*People v. Cudjo* (1993) 6 Cal.4th 585, 622.)

### c) *The Confrontation Clause and Evidence Code Section 1202*

Notwithstanding any alleged defects at the preliminary hearing, we also reject defendant's claim that Ruth's testimony impeaching Eva's former testimony was not admissible on confrontation grounds under either state or federal law.

We first note that Eva's statements to Ruth about the restraining order were not admissible for their truth as prior inconsistent statements under Evidence Code sections 1235 and 770. Those sections permit admission of inconsistent statements made by a witness who actually testifies at the proceeding. (*People v. Williams* (1976) 16 Cal.3d 663, 669.) Because Eva did not testify at trial, those sections do not apply here.

37

Nevertheless, as the trial court eventually recognized, Eva's statements to Ruth were admissible not for their truth but solely to impeach her former testimony. (Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1202, p. 27; Simons, Cal. Evidence Manual (2010) § 2.17, pp. 86-87.) Although the court did not admit the evidence under a specific Evidence Code section,[21] the statements were admissible under Evidence Code section 1202, which governs the impeachment of hearsay statements by a declarant who does not testify at trial. The jury was properly instructed on this point.[22]

Defendant argues for a more narrow interpretation of Evidence Code section 1202. He urges that the section forbids the prosecution from impeaching its own unavailable hearsay declarant with an inconsistent statement. He maintains that Evidence Code section 1202 allows only the *opposing party* to introduce the inconsistent statement. His argument fails.

---

[21] "If a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below." (*People v. Brown* (2004) 33 Cal.4th 892, 901.)

[22] Evidence Code section 1202 states, in relevant part: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct." "Section 1202 deals with the impeachment of a declarant whose hearsay statement is in evidence as distinguished from the impeachment of a witness who has testified. It clarifies two points. *First*, evidence to impeach a hearsay declarant is not to be excluded on the ground that it is collateral. *Second*, the rule applying to the impeachment of a witness — that a witness may be impeached by an inconsistent statement only if he is provided with an opportunity to explain or deny it — does not apply to a hearsay declarant." (Cal. Law Revision Com. reprinted at com., 29B pt. 4 West's Ann. Evid. Code, *supra*, foll. § 1202, p. 27.)

Defendant relies on *People v. Beyea* (1974) 38 Cal.App.3d 176 (*Beyea*), in which the prosecution introduced the preliminary hearing testimony of two unavailable witnesses. It impeached that evidence with one witness's testimony from a different preliminary hearing and with the other witness's statements to police. The prosecutor in *Beyea*, however, did not impeach the witnesses at the defendants' preliminary hearing. Instead, the impeaching statements were offered only at trial, after the witnesses had become unavailable. Although the decision does not make this point clear, it appears the inconsistent statements were admitted both for impeachment and for their truth. (*Beyea*, *supra*, 38 Cal.App.3d 176, 186, 193, fn.6.)

The *Beyea* court concluded it would be unfair to allow a party to impeach the former testimony of its own unavailable witnesses with their inconsistent hearsay statements unless the opposing party was able to cross-examine the declarant about the inconsistent statements. (*Beyea*, *supra*, 38 Cal.App.3d at p. 193, quoting *Am-Cal Investment Co. v. Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 542.) *Beyea* acknowledged that the language of Evidence Code section 1202 contains no such limitation, but referred to the Law Revision Commission's comment to section 1202, which states that the statute provides " 'a uniform rule permitting a hearsay declarant to be impeached by inconsistent statements in all cases, whether or not the declarant has been given an opportunity to explain or deny the inconsistency,' " with the caveat that " '[i]f the hearsay declarant is unavailable as a witness, the party *against whom* the evidence is admitted should not be deprived of both his right to cross-examine and his right to impeach.' " (*Beyea*, *supra*, 38 Cal.App.3d at p. 193.)

The court in *People v. Osorio* (2008) 165 Cal.App.4th 603, however, disagreed with *Beyea's* conclusion. In *Osorio*, the prosecution introduced the

39

spontaneous statement of the victim to a paramedic. It then impeached that statement with one the victim made during a later police interview. The victim died before trial and the defense never had the opportunity to cross-examine her. The trial court admitted the victim's statement to police for the limited purpose of impeaching the spontaneous statement. The *Osorio* court held the prosecution could impeach the hearsay statements of its own unavailable witness with her later inconsistent hearsay statement. (*Id*. at pp. 615-617.) *Osorio* reasoned there is nothing in the plain language of Evidence Code section 1202 "that gives rise to any ambiguity or lends support to *Beyea's* interpretation." (*Osorio*, at p. 616.) Moreover, *Osorio* noted that when the comments to the section were drafted in 1965 there was a general rule against impeaching one's own witness, but that rule was abrogated by the passage of Evidence Code section 785, part of the same bill that added Evidence Code section 1202, which allows the credibility of a witness to be attacked by any party. (*Osorio,* at pp. 616-617.) Because the Legislature did not expressly make Evidence Code sections 785 and 1202 mutually exclusive, *Osorio* concluded that both sections should be read together and "as a single statute, these two sections allow a prosecutor to use a prior inconsistent statement to partially impeach a hearsay statement the prosecutor had previously introduced." (*Id*. at p. 617.)

Accordingly, if the statements in *Beyea* were admitted for their truth, the Court of Appeal correctly concluded that the admission was error. The *Beyea* defendants were deprived of their opportunity to cross-examine as to those inconsistent statements not brought forward during the preliminary hearing. Similarly, the result in *Osorio* was also correct. The inconsistent statements at issue in *Osorio* were not hearsay because they were not admitted for their truth.

40

Accordingly, the defendant's inability to cross-examine the declarant about those statements raised no confrontation clause concerns.

In sum, the confrontation clause does not prohibit the prosecution from impeaching the former testimony of its own unavailable witnesses with their inconsistent statements, provided those statements are admitted only for impeachment purposes. However, under Evidence Code section 1202, the prosecution may not offer for their truth the inconsistent statements of a declarant who does not testify at trial. (*People v. Williams*, *supra*, 16 Cal.3d at p. 669.) Any language to the contrary in *People v. Beyea, supra,* 38 Cal.App.3d 176, is disapproved.

Here, Eva's statements to Ruth about the restraining order were not admitted for their truth. They were relevant for the limited purpose of impeachment and properly admitted.[23]

### d) Opinion Evidence

We also reject the contention that Ruth's testimony constituted improper opinion testimony about what Eva was thinking and intending when she obtained the restraining order. "Generally, a lay witness may not give an opinion about another's state of mind," but "a witness may testify about objective behavior and describe behavior as being consistent with a state of mind." (*People v. Chatman* (2006) 38 Cal.4th 344, 397.) Ruth's testimony was based on Eva's objective behavior. Eva verbalized her own state of mind. (Evid. Code, § 1250.) The actions Ruth observed that day were entirely consistent with that mind set.

---

[23] We will discuss the holding in *Crawford* in greater detail below. It is sufficient to observe that because the statements were not offered for their truth they do not implicate the confrontation clause under the *Crawford* rule. (*Crawford*, *supra*, 541 U.S. at p. 59, fn. 9.)

Moreover, Eva's expression of fear and her desire to obtain a restraining order were not admitted for their truth, but to impeach her preliminary hearing testimony in which she denied writing that she was afraid of defendant and denied knowing about a restraining order.

### 2. Eva's statements after the murders

Relying on the spontaneous statement exception to the hearsay rule (Evid. Code, § 1240), the prosecutor filed a pretrial motion to introduce hearsay statements Eva made to her neighbor, John Adams, immediately after the shooting, statements she made to an arriving police officer, and statements she made about an hour later to her son James and his wife in the presence of a city mental health worker. Defendant opposed the admission of these statements, arguing they did not qualify as spontaneous statements, were improper opinion testimony, were more prejudicial than probative, and were unreliable and untrustworthy in violation of due process and his Sixth Amendment right to confrontation. The court rejected defendant's arguments, admitting all of these statements under Evidence Code section 1240. Defendant challenges each of these rulings.

### a) Eva's Statements to Officer Nielsen

Based on the dispatched report of a murder-suicide, Officer Nicholas Nielsen contacted Eva and her neighbor outside Eva's home. In the 911 call, neighbor John Adams had erroneously reported that defendant had killed his sister and then shot himself. The dispatcher repeated Adam's report in sending officers to the scene. Nielsen described Eva as teary-eyed, distraught, and very agitated.[24] She appeared anxious to talk with him. As he approached her, Eva spoke first,

---

[24] Adams described Eva similarly, and noted she appeared to have blood on her feet.

42

telling him her daughter and grandson had been shot and were probably dead. Because Eva's statement suggested an armed murderer was at large, Officer Nielsen asked questions to obtain more information before the officers risked going inside the home to aid the victims. Eva explained that defendant had come into the house earlier and had spoken with her briefly. He then argued with his sister and shot the victims. Eva said she did not see defendant carrying a gun, but assumed he had concealed it. Nielsen asked if defendant was still inside the home. Eva said she did not know, and described the clothing defendant had been wearing. According to Nielsen's report, Adams pointed out that defendant was probably gone because his car was no longer in the driveway. Nielsen spoke with Eva and Adams for 10 to 15 minutes. Eva remained upset throughout the conversation. Nielsen took notes as they spoke so he could accurately relay information to the dispatcher and his fellow officers. Three to four minutes into the conversation with Eva and Adams, other officers arrived and went inside the main house. After the conversation, Nielsen checked defendant's cottage but did not find him there.

Because Eva's statements were made out of court and admitted for their truth, they constituted hearsay. (Evid. Code, § 1200, subd. (a).)[25] We first consider whether they fell under a California hearsay exception and then whether their admission violated the Sixth Amendment of the United States Constitution as it has been applied in *Crawford* and its progeny.[26]

---

[25] " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).)

[26] For trial courts considering the question of admissibility, this is the proper order of analysis. If a proffered statement does not satisfy a hearsay exception, it is inadmissible and a further *Crawford* consideration is unnecessary.

43

### i) Spontaneous Statement

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.)

Defendant does not dispute that Eva was hysterical when she spoke with Officer Nielsen. Under these circumstances the court properly concluded that the statements were made when Eva was under the domination of nervous excitement caused by the event, so that her utterances were spontaneous and unreflecting.

Instead, defendant argues that the statements were inadmissible because there was insufficient foundation that she had "witnessed" the killings. She did not tell anyone she had actually seen the shootings, and told an inspector the next day that she could not see into the dining room where the shots were fired. Defendant's argument fails.

The Evidence Code does not use the term "witnessed by." Rather, it refers to an act, condition, or event "perceived by" the declarant. (Evid. Code, § 1240, subd. (a).) While the phrase "witnessed by" was used in *People v. Gutierrez* (2009) 45 Cal.4th 789, 809-810, the phrase was used to describe the circumstances in that case. It was not used to modify the language of the statute itself by imposing a different foundational requirement. More importantly, in *People v. Poggi* (1988) 45 Cal.3d 306, the court noted spontaneous statements may include the " 'sincere expression' " of the speaker's " 'actual impressions and belief.' " (*Id.* at p. 318, quoting *Showalter v. Western Pacific R.R. Co.* (1940) 16 Cal.2d 460, 468.)

There are many ways someone can acquire the personal knowledge required to support a conclusion that the person perceived an event. Eva saw defendant enter her room and leave. Shortly thereafter, she heard Versenia's exclamation followed by a gunshot. She emerged from her room to see Versenia fall, bleeding. She was understandably traumatized by what she perceived: a shooting in her home, her daughter and grandson lying on the floor mortally injured. These observations were clearly relevant to the circumstances of the shooting. Nothing indicated she was insincere in her quite logical belief that defendant had shot the victims. At best, the issue of whether Eva actually saw defendant fire the shots went to the weight of her statements, not their admissibility. (*People v. Riva* (2003) 112 Cal.App.4th 981, 996.) Accordingly, Eva's statements to both John Adams and Officer Nielsen properly qualified as spontaneous statements.

*ii) Sixth Amendment Right to Confrontation*

In *Crawford*, the United States Supreme Court reexamined the application of the Sixth Amendment to the admission of hearsay statements. *Crawford* did not replace a conventional hearsay analysis. Instead, it added a second layer of inquiry when hearsay is offered against a criminal defendant. *Crawford* established, except in circumstances not relevant here, if a hearsay statement is testimonial in nature it cannot be introduced against a criminal defendant unless the declarant is unavailable, and the defendant had a previous opportunity to cross-examine the declarant. (*Crawford*, *supra*, 541 U.S. at pp. 53-54.) The *Crawford* court did not give a comprehensive definition of the term "testimonial" and subsequent cases have addressed how the rule should be applied. The court has recently considered that question in *Michigan v. Bryant* (2011) ___ U.S. ___ [131 S.Ct. 1143] (*Bryant*).

45

There, the court reviewed the evolution of the *Crawford* rule and iterated that " 'the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused.' " (*Bryant*, *supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1152], quoting *Crawford*, *supra*, 541 U.S. at p. 50.) "[T]he word 'witnesses' in the Sixth Amendment" is defined as "those who ' "bear testimony." ' " (*Bryant*, *supra*, ___ U.S. at p. ___ [131 S.Ct. at pp. 1152-1153], quoting *Crawford*, *supra*, at p. 51.) "Testimony," in turn, is a " ' "solemn declaration or affirmation made for the purpose of establishing or proving some fact." ' " (*Bryant*, *supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1153], quoting *Crawford*, *supra*, at p. 51.)

The majority opinion in *Bryant* again pointed out that "not all those questioned by the police are witnesses" for purposes of the Sixth Amendment and not all " 'interrogations by law enforcement officers' [citation], are subject to the Confrontation Clause." (*Bryant*, *supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1153], quoting *Crawford*, *supra*, 541 U.S. at p. 53.)

*Bryant* noted that in the cases decided to date, the term "police interrogation" has been used to describe " 'interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator.' " (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1153], quoting *Davis v. Washington* (2009) 547 U.S. 813, 826 (*Davis*).) In *Bryant*, the court contrasted the companion cases decided by *Davis*, *State v. Davis* (Wn. 2005) 111 P.3d 844 and *Hammon v. State* (Ind. 2005) 829 N.E.2d 444, to tease out the factors at play in determining what facts make a hearsay statement "testimonial." (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at pp. 1153-1156].)

46

In *State v. Davis,* a woman called 911 to report her boyfriend was beating her with his fists. Her statements were made in the present tense and the police operator asked for the perpetrator's name, which the caller gave. She then told the operator the boyfriend had driven off. The 911 tape was admitted at defendant's trial when the caller failed to appear. (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1153], citing *Davis, supra,* 547 U.S. at pp. 817-819.)

In *Hammon v. State*, police went to the Hammon home following a report of domestic violence. They arrived to find Amy Hammon alone on her front porch. She initially told them that nothing was wrong. Officers went inside with Amy's permission. There, they found broken glass on the floor and Hershel Hammon in the kitchen. One officer kept Hershel there while Amy was taken into the living room and told the other officer what happened. Amy then wrote and signed a "battery affidavit," summarizing Hershel's assault on her. When Amy failed to appear at Hershel's trial, both her oral and written statements were admitted through an officer's testimony. (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1154], citing *Davis, supra,* 547 U.S. at pp. 819-820.)

As discussed in *Bryant*, the *Davis* court distinguished the two cases, holding the statements in *Hammon v. State* were testimonial while those in *State v. Davis* were not. The *Bryant* court summarized the differences between them. In *Davis*, the events related to the operator were actually happening, as opposed to past, completed events. The beating of the caller was an ongoing emergency that the statements were elicited to resolve. The statements were not formal but a call for help. By contrast, in *Hammon v. State* whatever had occurred was over when the officers arrived. Amy said there was nothing wrong and there was no apparent ongoing danger. The questioning of Amy was part of an investigation into past conduct. Finally, the circumstances in which Amy was subjected to, organized and

47

structured questioning in a separate room focused on past events that were potentially criminal and resulted in the preparation of a written and signed affidavit, were sufficiently formal to be consistent with the acquisition of a testimonial statement. (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at pp. 1154-1155].)

The *Bryant* court concluded from its review of *Davis*, "[t]hus, the most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court- statements [offered for their truth] are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial. [Fn. omitted.]" (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1155].) While the court specifically reserved whether "statements made to someone other than" a law enforcement officer might be testimonial (*id.* at p. ___ [131 S.Ct. at p. 1155], fn. 3), the only cases the high court has considered to date have involved statements by or to a government agent.[27] (Cf. *People v. Cage* (2007) 40 Cal.4th 965, in which statements made by a victim to a police officer were held to be testimonial while substantially similar statements given to a physician were not testimonial.)

It is the "primary purpose of creating an out-of-court substitute for trial testimony" that implicates the confrontation clause. (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1155].) Consequently, if a statement is not offered for its truth, or is nontestimonial in character, the confrontation clause is not a bar to

---

[27]     *Bullcoming v. New Mexico* (2011) ___ U.S. ___ [131 S.Ct. 2705] and *Melendez-Diaz v. Massachusetts* (2009) ___ U.S. ___ [129 S.Ct. 2527], both involved forensic laboratory reports written by analysts employed at a state laboratory required by law to assist in police investigations, and, in both cases, the high court concluded the analysts' statements were testimonial.

admission. Thus, the touchstone questions are whether a statement is hearsay offered against a criminal defendant, whether the statement is otherwise admissible under a hearsay exception, and, if so, whether the statement is testimonial.

*Bryant* counsels that to determine the primary purpose with which a statement is given by the declarant or obtained by an officer a court must consider a number of factors:

1) The court must objectively evaluate the circumstances of the encounter along with the statements and actions of the parties. In this latter regard, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions" in the given situation. (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1156].)

The inquiry is on the *primary* purpose of both officer and declarant. A majority of the court in *Bryant* recognized that both participants may have mixed motives. An officer, even when responding to an emergency, remains an investigator and, thus, is not indifferent to the gathering of evidence. Likewise, victims and other declarants may or may not want to see a perpetrator ultimately prosecuted. The question remains, when viewed objectively, what is the *primary* purpose of both declarant and officer? (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1161].)

2) The court should consider whether an " 'ongoing emergency' " exists, or appears to exist, when the statement was made. Such an ongoing emergency focuses the participants on something other than obtaining evidence for trial. (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1157].) Again, the analysis is objective. Even if hindsight reveals that an emergency did not, in fact, exist, if it reasonably appeared to exist based on the information known when the statement

49

was made the emergency test is satisfied. (*Id.* at p. ___ [131 S.Ct. at p. 1157], fn. 8.)

The majority took care to clarify that the existence of an emergency is not the only circumstance in which a hearsay statement may not qualify as testimonial. (See *Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1155] ["[T]here may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony"]; *id*. at p. 1157, fn. 9 [discussing other exceptions to the hearsay rule, which, "by their nature [were] made for a purpose other than for use in a prosecution"].)

3) Whether an ongoing emergency exists is a "highly context-dependent inquiry." (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1158].) Even when a threat to an initial victim is over, a threat to first responders and the public may still exist. The type of weapon involved may expand or limit the duration and scope of the emergency. A situation created by the use of fists may involve less ongoing danger than the use of a firearm. (*Ibid*.)

4) The medical condition of the declarant is a relevant consideration, as it bears on both the injured declarant's purpose in speaking and the potential scope of the emergency. (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1159].) As the high court describes it, the declarant's medical condition "sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one." (*Ibid*.)

5) A nontestimonial encounter addressing an emergency may evolve, converting subsequent statements into testimonial ones. A real or apparent emergency may resolve itself. The disarming or capture of a perpetrator may end

50

the danger. It may become clear from the declarant and officer's statements or behavior that the focus has shifted from meeting the emergency to obtaining evidence for trial. (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at pp. 1159-1160].)

6) Finally, regardless of the existence of an emergency, the informality of the statement and the circumstances of its acquisition are important considerations. Inquiries that are conducted in a disorganized way and in turbulent circumstances are distinguishable from a jailhouse interview, as in *Crawford*, or the sequestered and formal preparation of an affidavit, as in *Hammon v. State*. (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1160].)

In *Bryant*, police responded to a report that a man had been shot. The arriving officers found the victim lying on the ground next to his car at a gas station parking lot, bleeding and mortally wounded by a gunshot to his abdomen. (*Bryant, supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1150].) The officers asked the victim " 'what had happened, who had shot him, and where the shooting had occurred.' " (*Ibid.*) The victim said Bryant had shot him outside Bryant's home, and provided the details of how he had been shot. He relayed that he fled from Bryant's home, and drove himself to the gas station. The victim's conversation with police lasted 5 to 10 minutes, ending when paramedics arrived. (*Ibid.*)

In applying the previously described factors to the facts before it, the high court concluded that the encounter between the police and the victim did not produce testimonial hearsay. (*Bryant*, *supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1167].) The court noted the continuing emergency went beyond any private dispute between Bryant and the victim. Neither the victim nor the police knew the current location of the armed shooter. (*Id.* at p. ___ [131 S.Ct. at p. 1164].) In addition, because the victim did not disclose the motive of the shooting, "[t]he

51

police did not know, and [the victim] did not tell them, whether the threat was limited to him." (*Ibid*.) There was no indication that the emergency had ended because the victim gave the police "no reason to think that the shooter would not shoot again if he arrived on the scene." (*Id.* at p. ___ [131 S.Ct. at p. 1166].) The court also noted that the victim was bleeding, "had difficulty breathing and talking," and was in considerable pain. These facts did not suggest that he made his statements with the " 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.' " (*Id.* at p. ___ [131 S.Ct. at p. 1165], quoting *Davis*, *supra*, 547 U.S. at p. 822.) As for the informality of the encounter, unlike a formal stationhouse interrogation, "the questioning in this case occurred in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion" and the circumstances revealed that "the situation was fluid and somewhat confused," as different officers arrived with each asking " 'what had happened.' " (*Byrant*, *supra*, ___ U.S. at pp. ___, ___ [131 S.Ct. at pp. 1160, 1166].) Finally, the court considered the statements and actions of the parties. The officers, by asking the victim what had happened, who had shot him, and where the shooting took place, posed "the exact type of questions necessary to allow the police to ' "assess the situation, the threat to their own safety, and possible danger to the potential victim" ' and to the public [citations], including to allow them to ascertain 'whether they would be encountering a violent felon,' [citation]." (*Id.* at p. ___ [131 S.Ct. at p. 1166], quoting *Davis*, *supra*, 547 U.S. at pp. 827, 832.)

### *iii) Eva's Statements to Nielsen and Adams Were Not Testimonial*

We apply the *Bryant* analysis to the case at hand. Eva's statements to Officer Nielsen and her neighbor John Adams were hearsay because they were made out of court and offered for their truth. (Evid. Code, § 1200.) As we have explained, they satisfied the spontaneous utterance exception to the hearsay rule. They were offered against defendant at his criminal trial. However, we conclude they were not testimonial.

Officer Nielsen arrived within four minutes of Adams's 911 call. The bodies were still inside. Eva did not know if defendant was still present. During a 10 to 15 minute conversation Officer Nielsen asked Eva questions about the shooting, what defendant was wearing and whether he was armed. Nielsen took notes so he could relay information to the dispatcher and other officers. During this period it was ascertained that defendant was neither in Eva's house nor the cottage behind it. Thus, the shooter had fled the scene and was presumed to be armed with the firearm that was the murder weapon. His motive and whereabouts were unknown. The audio recording of police radio traffic confirms that during the initial 15 minutes following the 911 call officers were trying to assess the emergency and determine whether the shooter was dead or still in the neighborhood. It was objectively reasonable to believe that an armed shooter remained at large and presented an emergency situation.

Objectively, the primary purpose of both Eva and Officer Nielsen was to deal with that emergency, not to create an out-of-court substitute for trial testimony. Instead, the primary purpose for both of them was to determine defendant's whereabouts and evaluate the nature and extent of the threat he posed.

Eva was greatly upset throughout her encounter with Officer Nielsen. The discussion in her yard, in the presence of a neighbor, was in an open setting and

53

under chaotic conditions. As a result, it was much more similar to the parking lot questioning in *Bryant* than the more calm and formal circumstances of *Crawford*[28] and *Hammon v. State.*

As noted, the Supreme Court has not addressed whether statements "to someone other than law enforcement personnel" can ever qualify as testimonial. (*Bryant*, *supra*, ___ U.S. at p. ___ [131 S.Ct. at p. 1155], fn. 3; see discussion, *ante*, at p. 48.) Setting this question aside, just as the statements to Nielsen were nontestimonial, Eva's exclamations to neighbor John Adams as she ran from her home were not made or received to create an out-of-court substitute for trial testimony.

### b) Eva's Statements to James and Frances Blacksher

Inspector Alan Bierce testified that he arrived at the crime scene after Officer Nielsen and made contact with Eva. He placed Eva in his patrol vehicle and, because she appeared "distressed" and "fragile," he decided not to take a statement from her, but instead called city mental health worker Darryl Brand to assist her. When Brand arrived, Officer Bierce directed her to help Eva and left them alone. Brand asked Eva if she wanted any of her family members called to the scene, and Eva asked for James and Frances Blacksher. They arrived shortly thereafter and went to the patrol car to comfort Eva, who remained upset and was screaming. James and Frances separately asked Eva what had happened. She told each of them that defendant had shot the victims and that Versenia had fallen into her arms after she had been shot.

---

**28**     In *Crawford*, the declarant was in police custody and a possible suspect when she gave her tape-recorded statements in response to questioning by detectives. (*Crawford*, *supra*, 541 U.S. at pp. 38, 65.)

Although they were made well over an hour after the murders, this lapse of time did not purge Eva's statements of their spontaneity. " 'The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker. The nature of the utterance — how long it was made after the startling incident and whether the speaker blurted it out, for example — may be important, but solely as an indicator of the mental state of the declarant . . . . [U]ltimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter.' " (*People v. Brown* (2003) 31 Cal.4th 518, 541, quoting *People v. Farmer* (1989) 47 Cal.3d 888, 903-904.)

In *People v. Brown*, we concluded that a statement was properly admitted as spontaneous under Evidence Code section 1240, even though made two and one-half hours after the shooting. The witness was still crying and trembling at the time he expressed his belief that the defendant had shot and seriously injured the victim. (*People v. Brown, supra,* 31 Cal.4th at p. 541.) Similarly, Eva "continued to labor mightily under the emotional influence of the disturbing events" she had perceived. (*Ibid*.) Frances described Eva as "very angry" and "terribly upset."[29] James described his mother as hysterical, upset, and "screaming and hollering."

---

[29] Frances, however, initially described Eva as "very calm" and more calm then herself when she first made contact with Eva at the patrol car. She also described Eva as having a "drawn" and "cold" demeanor. In any event, we need not reweigh any conflicting evidence as to Eva's demeanor when she spoke to Frances. Even assuming Eva's statements to Frances were not spontaneous for purposes of Evidence Code section 1240, their admission could not have been prejudicial by any standard because they were identical to the statements Eva made to James, and were therefore cumulative.

On this record, the court properly concluded Eva's statements to James and Frances were spontaneous and admissible under Evidence Code section 1240.

Defendant also claims these statements were testimonial because they were made while Eva was in a police car, in the presence of a city mental health worker, and with multiple officers nearby. Yet, these statements were not made in response to police interrogation or to any police agent, but to family members whose presence she had requested. These statements of a distraught mother and grandmother to those offering solace completely lacked the "formality and solemnity characteristic of testimony." (*People v. Cage*, *supra*, 40 Cal.4th at p. 965, 984.) The presence of a city mental health worker and officers outside the vehicle is irrelevant. Ms. Brand was not part of the police investigation, but present to assist an emotional and fragile person. The fact that officers were somewhere at the scene did not transform Eva's words to family members into "testimonial statements" as that term is understood in the *Crawford* context. (*Cage* at p. 987.)

### 3. Eva's Written Statements to Inspector Bierce the Day After the Murders

Defendant also challenges the admission of Eva's statements to Inspector Alan Bierce, made during a police interview the day after the murders, which he reduced to a writing she then signed. In those statements, Eva described seeing defendant exit her bedroom, walk down the hallway, and turn into the dining room. Thereafter, she heard gunshots. Eva then saw Versenia enter the hallway, turn toward the dining room and say something like, "What are you doing?" or "What is wrong with you?" before hearing a single shot and seeing Versenia fall to the floor. She heard a total of three shots.

Defendant argues that these statements were admissible only if defendant had a prior opportunity to cross-examine Eva about them. Although he did have the opportunity to cross-examine Eva at the preliminary hearing, he claims this cross-examination was ineffective because of her failing memory. He further argues the statements were not admissible as prior inconsistent statements.

Defendant has forfeited any appellate challenge to this evidence by failing to object to it below. Before trial, defendant did not challenge the admission of Eva's statements to Inspector Bierce, and the court made no pretrial ruling on their admission. When Inspector Bierce testified at trial, defense counsel made no objection when the prosecutor asked him to repeat Eva's statements to him. Some of Eva's statements to Bierce were beneficial to defendant's case, and defense counsel solicited them in cross-examining Inspector Bierce.[30] Under these circumstances, defendant had a tactical reason not to block Bierce's testimony, and he cannot now claim that the testimony was admitted in error. (*People v. Riel* (2000) 22 Cal.4th 1153, 1185 [rejecting a similar evidentiary claim, noting that the defendant there "did not object to this evidence at trial; indeed, he elicited some of it himself"].)

---

[30] The defense emphasized the following points in regard to Eva's statements to Inspector Bierce: Eva describing defendant's demeanor as normal and unagitated when he greeted her before the shootings; Eva describing how she could not see into the dining room where the shots occurred and did not see defendant after the gunshots; her failure to mention that Versenia fell into her arms after being shot; and the lack of any statement indicating that Eva believed defendant was the shooter.

**B.  Evidentiary Rulings Concerning Defendant's Mental Problems**

Defendant contends the court improperly prevented him from introducing evidence of his mental health problems and from impeaching the testimony of his family members who claimed not to know of these problems.  He also claims the court treated the prosecution deferentially, allowing that side to present evidence rebutting defendant's claims on this topic.  He maintains the court's rulings denied him his federal constitutional rights to due process and to present a defense.  His contentions lack merit.  The court properly ruled that the evidence was either irrelevant or called for inadmissible hearsay, and defendant made no offer of proof to establish the admissibility of the disputed evidence.

A trial court has broad discretion in determining relevancy, but it cannot admit evidence that is irrelevant or inadmissible under constitutional or state law. (*People v. Morrison* (2004) 34 Cal.4th 698, 724.)  "The proponent of proffered testimony has the burden of establishing its relevance, and if the testimony is comprised of hearsay, the foundational requirements for its admissibility under an exception to the hearsay rule.  [Citations.]  Evidence is properly excluded when the proponent fails to make an adequate offer of proof regarding the relevance or admissibility of the evidence. [Citations.]"  (*Ibid.*; Evid. Code, § 1200, subd. (b).)

Defendant complains the court erred in sustaining the prosecution's objections to defense counsel's questions:  1)  Whether Sammie Lee, defendant's former brother-in-law, had heard "other family members" refer to defendant as "crazy;" 2)  Whether Eva had told her neighbor, John Adams, that defendant had mental problems; 3)  Whether Officer Nielsen, in responding to the scene of the murders, heard either the radio dispatch or Adams mention that defendant had mental problems; 4)  Whether defendant's sister, Ruth Cole, had read Officer Mesones's police report, in which he described defendant as "schizophrenic and

58

paranoid;" 5)  Whether James, defendant's brother, had been told that defendant became agitated and difficult when he was off his medication; 6)  Whether Officer Nielsen was personally aware of defendant's mental condition based on his prior visits to the Blacksher household; and 7)  Whether James thought defendant was acting in a paranoid manner when defendant visited him a few days before the murders.

With the exception of the last two rulings, all of defense counsel's inquiries called for hearsay, and defense counsel made no attempt to offer a relevant hearsay exception.  As a result, the court properly sustained the prosecution's hearsay objections.

Furthermore, although Sammie Lee, Ruth Cole, and James each denied having any prior knowledge of defendant's mental problems or related hospitalizations, none of the proffered hearsay statements impeached their prior knowledge, but instead involved the beliefs of other persons.[31]  In addition, the issue of whether Officer Nielsen or John Adams believed or knew that defendant had mental problems had no relevance to any matter in the proceedings because they were not in a position to evaluate defendant's mental state in the days leading up to the murders.  Furthermore, Officer Nielsen and Adams did not deny having knowledge of defendant's psychiatric history.  Thus, a prior inconsistent statement exception was not available.

Whether James believed that defendant was "paranoid that everyone was against him" when defendant visited him a few days before the murders may have

---

[31]    In contrast, the evidence the prosecution was allowed to admit, over defendant's objection, did not call for hearsay or the beliefs of other third parties. Instead, the evidence involved the witness' own descriptions of defendant's relationships with Eva and Torey.

been relevant, but the court sustained the prosecution's objection to this question on the ground it called for a "medical conclusion." It appears that defense counsel was seeking a lay description of defendant's behavior, not an expert evaluation of paranoia. Even assuming an error that defendant did not forfeit, however, James's description of defendant as behaving in a paranoid manner on the night he visited him would have added little to defendant's case. James, his wife Frances, and defendant's brother Elijah all testified in great detail as to defendant's behavior that night, and the jury was free to draw its own conclusion as to whether defendant behaved abnormally then.

Finally, we reject defendant's contention that, despite the rules of evidence, the federal constitutional right to present a defense prevails over state evidentiary rules to invalidate the court's rulings. Again, defendant forfeited this contention by not raising it below, and it lacks merit in any event. "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834.) Defendant fails to persuade us that the application of these rules prejudiced the ability to defend his case.

Here, defendant was permitted to introduce extensive evidence relevant to his mental defense. The excluded evidence was of slight value in comparison to the substantial evidence admitted. In order to impeach those family members who denied knowing any of defendant's mental history, defendant was permitted to introduce Dr. Davenport's detailed testimony regarding his numerous hospitalizations and various diagnoses. The jury also learned that defendant had received government disability payments based on his diagnosis of paranoid schizophrenia. Finally, they also heard John Adams testify and state in his 911 call that he believed defendant had had a "case of mental illness . . . over the years"

60

and was "crazy." Given the volume of other evidence admitted under the ordinary rules of evidence, defendant's constitutional challenge to those rules lacks merit.

### C. Failure to Limit Cross-examination of Defense Expert

Defendant claims the court improperly permitted the prosecution to cross-examine Dr. Davenport on matters that went beyond the limited purpose for which his testimony was admitted:  to impeach family members who claimed not to know of defendant's mental problems.  He argues the cross-examination elicited irrelevant and prejudicial testimony and violated his Fifth Amendment right to remain silent by discussing statements defendant had made during his prior competency evaluations.  We disagree.

The court admitted Dr. Davenport's testimony about defendant's psychological history to impeach the family members who claimed to be unaware of it.  The court told the jury that the testimony could be only considered for that purpose, and not as evidence that defendant suffered from a mental illness when the charged crimes occurred or that he lacked the mental state to commit them.

In 1975 defendant was committed to Napa State Hospital for suicidal thoughts.  Over defendant's objection, the prosecutor cross-examined Dr. Davenport about the circumstances of that commitment.  Through a hypothetical question, the prosecutor elicited from Dr. Davenport that it would be unusual for a person not to manifest any acute symptoms of paranoid schizophrenia, assuming he had the disorder and had received no mental health treatment in the eight-year period between 1986 and 1994.[32]  Over defendant's objection, Dr. Davenport

---

[32]  Defendant also argues he was prejudiced by the prosecutor's use of this hypothetical because it incorrectly assumed defendant received no treatment for mental illness between 1986 and 1994.  But the parties later recognized the error and stipulated that the jury be told that defendant had received medical treatment

*(Footnote continued on next page.)*

admitted on cross-examination that this gap in treatment would cast doubt on the accuracy of a schizophrenia diagnosis.  Over defendant's objection, Dr. Davenport also testified that 1984 medical records indicated defendant had refused to take his medications.  The prosecutor asked for a definition of "malingering" and questioned the doctor about his 1984 and 1996 competency evaluations of defendant.  According to Dr. Davenport, in 1996 defendant denied having any hallucinations, did not appear delusional, understood the charges against him, and "vehemently denied" any involvement in the murders.  According to Dr. Davenport, in 1984 defendant did not manifest any signs of psychosis or mental disorder, appeared to be able to think rationally, and was otherwise competent to stand trial.

In chambers, the prosecutor asked to have Dr. Davenport return on the following court day for additional cross-examination.  The court refused and admonished the prosecutor, stating that he was getting "way beyond" the purpose of the doctor's testimony.  The court noted that the defense had not made "objections in depth" to the prosecutor's questions about Dr. Davenport's competency evaluations and that the defense had opened the door to some of that testimony by raising the doctor's reports on direct examination.  Defense counsel noted that he had objected "as long as [he] could, but [he] kept getting overruled."

Under the state and federal Constitutions, the privilege against self-incrimination applies to competency examinations.  Consequently, a defendant cannot be " 'convicted by use of his own statements made at a court-compelled

_____

*(Footnote continued from previous page.)*

for a psychiatric disorder eight times between 1986 and 1996.  The effect of any error was substantially minimized by that stipulation.

62

[competency] examination.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 960, quoting *People v. Arcega* (1982) 32 Cal.3d 504, 522; see also *People v. Pokovich* (2006) 39 Cal.4th 1240, 1246.)  Unless the defendant has made a valid waiver under *Miranda v. Arizona* (1966) 384 U.S. 436, the statements he or she makes during a competency examination enjoy immunity and cannot "be used by the prosecution to prove its case-in-chief as to either guilt or penalty" or to impeach a defendant at trial.  (*People v. Pokovich*, *supra*, 39 Cal.4th 1240, 1246, 1253; see also *People v. Weaver*, *supra*, 26 Cal.4th at p. 960, citing *Arcega*, *supra*, 32 Cal.3d at p. 523, and *Estelle v. Smith* (1981) 451 U.S. 454.)

Defendant lodged unsuccessful objections to many of the prosecutor's questions on various grounds, but did not specifically object to the questions about Dr. Davenport's competency examinations of defendant.  To the extent defendant failed to lodge a Fifth Amendment objection to the prosecutor's questions about the prior competency examinations, this claim is forfeited.  (*People v. Weaver, supra,* 26 Cal.4th 876, 961.)  We disagree that any objection would have been futile, given the clarity of case law on this subject and the fact that the court sustained at least one of defendant's objections during the prosecutor's cross-examination.  Even if the in-chambers discussion could be construed as evidence that defense counsel was objecting generally to this evidence, counsel failed to state any Fifth Amendment basis for the objection. (See *People v. Kennedy* (2005) 36 Cal.4th 595, 612.)  As the court noted, however, it was the defense that began the inquiry by asking about those interviews on direct examination.

Even assuming error, defendant fails to show prejudice.  In cross-examination, the prosecutor elicited statements defendant had made during the 1996 competency evaluation in which he denied experiencing any hallucinations, denied being delusional, said he understood the charges against him, and denied

guilt. But on redirect examination, Dr. Davenport stated that during his 1996 competency evaluation defendant appeared to be responding to hallucinations and made delusional statements, and explained it was common for mentally ill persons to deny their illness. This testimony helped clarify Dr. Davenport's earlier cross-examination testimony and to impeach the testimony of family members who denied knowing of defendant's mental illness. As to defendant's statements about understanding the charges against him and denying his guilt, defendant's actions after the murders showed that he understood his culpability and that he was trying to deflect guilt from himself and, initially, to avoid apprehension. Before he fled the state, defendant telephoned his relatives, claiming that masked men were responsible for gunshots inside his mother's home. Moreover, the court instructed the jury that Dr. Davenport's testimony could be considered only to impeach defendant's family members who denied knowing that defendant suffered from any mental illness, not "to show or negate the capacity of the defendant to form [the mental states] required for the commission of the crimes charged." Under these circumstances, any error was harmless beyond a reasonable doubt. (*People v. Pokovich*, *supra*, 39 Cal.4th 1240, 1254-1255, citing *Chapman v. California* (1967) 386 U.S. 18.)

As for the remaining portions of the prosecutor's cross-examination, there was no error. "It is settled that the trial court is given wide discretion in controlling the scope of relevant cross-examination." (*People v. Farnam, supra*, 28 Cal.4th 107, 187.) Moreover, " 'it is well settled that the scope of cross-examination of an expert witness is especially broad; a prosecutor may bring in facts beyond those introduced on direct examination in order to explore the grounds and reliability of the expert's opinion. [Citations.]' " (*People v. Loker* (2008) 44 Cal.4th 691, 739, quoting *People v. Lancaster*, *supra*, 41 Cal.4th at p.

64

105.)  Given that the defense went into some of the details regarding defendant's prior hospitalizations and medications, the court properly allowed the prosecution to point out that Dr. Davenport did not personally observe defendant during those commitments and that defendant refused to take his medication, yet had not been committed in the eight years preceding the murders.  This inquiry was relevant to support the prosecution's argument that it was possible for defendant's family members not to have noticed any signs of his mental problems.

### D.  The Court's Biased Treatment of Counsel

Defendant contends the court treated counsel differently and made disparaging remarks to defense counsel, thus aligning itself with the prosecution in violation of defendant's federal constitutional right to due process and a fair trial. We disagree.

" 'Although the trial court has both the duty and the discretion to control the conduct of the trial [citation], the court "commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution" [citation].  Nevertheless, "[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior." [Citation.]  Indeed, "[o]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid.  Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial." [Citation.]' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 373, quoting *People v. Snow* (2003) 30 Cal.4th 43, 78.)

At the outset, because defendant raised no objection below on the grounds he now raises on appeal and did not ask for a jury admonition to address the court's alleged intemperance towards his defense attorneys, he has forfeited this claim. (*People v. McWhorter*, *supra*, 47 Cal.4th at p. 373.)

Even if the issue had been preserved, we have reviewed each complained-of remark, and find no error.

On one occasion, Defense Counsel Thomas Broome tried to elicit what a witness believed defendant knew, and the prosecutor objected to the question as speculative. Defense counsel's only response to this objection was, "It is a question. It is cross-examination," and the court sustained the objection, commenting that "we don't throw out the rules of evidence just because you're on cross." On another occasion, Broome tried to introduce Elijah's hearsay statements about Torey's behavior as prior inconsistent statements when, in fact, they were not inconsistent with Elijah's testimony. When counsel tried a second time to admit similar inadmissible hearsay, the court again sustained the prosecutor's objection and said, "nice try." Counsel, undeterred, unsuccessfully tried a third time, stating, "I have to keep trying, judge."

It can be difficult to ascertain the emotional content of such exchanges from a cold record. However, to the extent the court's comments to Broome were a reflection of frustration and irritation at counsel's repeated efforts to elicit inadmissible hearsay, they were not improper. "[S]uch manifestations of friction between court and counsel, while not desirable, are virtually inevitable in a long trial." (*People v. Snow*, *supra*, 30 Cal.4th 43, 78-79.)

In beginning her cross-examination of Elijah, Defense Counsel Trina Stanley commented on the prosecution's repeated use of a transcript of Elijah's police interview to refresh his memory during direct examination. She asked

66

Elijah to turn over his copy of the transcript, telling him "we're not going to be restricted to the script." The prosecutor said the comment was inappropriate and the court remarked, "That was uncalled for, Ms. Stanley." Soon after, defense counsel unsuccessfully tried to elicit from Elijah speculation about whether other family members knew defendant had mental problems. After the court sustained two objections on the subject, Stanley, apparently while reading from Elijah's police interview transcript, asked a third question that called for inadmissible evidence. The court sustained the prosecutor's objection and remarked, "Going back to the script now, Ms. Stanley?" Later, Stanley tried to establish that Elijah was a reluctant witness by asking him whether police officers were present to prevent him from leaving the courtroom. The prosecutor objected to this question as "really improper," and the court warned defense counsel, "Please don't make me have to admonish you in front of the jury again." Finally, during his cross-examination of Dr. Davenport, the prosecutor asked hypothetically whether the doctor would doubt defendant's prior diagnosis of paranoid schizophrenia if he had received no mental health treatment since 1986. Defense Counsel Stanley objected, asserting the hypothetical lacked foundation and was "skirting on misconduct."[33] The court told defense counsel, "I don't know how many times I have to ask you not to do that," and the court told the jury it was improper for the defense to use "that kind of language regarding misconduct in an attempt to persuade you one way or the other about [the prosecutor's] conduct."

The court's comments to Defense Counsel Stanley were appropriate; she repeatedly asked questions designed to elicit inadmissible evidence. The court's

---

[33] Defense Counsel Stanley did not properly explain the basis of her objection until a subsequent in-chambers discussion. (See *ante*, fn. 32.)

67

comment relating to defense counsel's use of the transcript may have been sarcastic but did not amount to judicial misconduct.

### E.  The Admission of Autopsy Photographs

Defendant claims the court erroneously admitted autopsy photographs of the victims that were irrelevant, cumulative, and unduly prejudicial in violation of his federal constitutional rights to due process and a fair trial.  The complained-of photographs include two photographs showing the exit and entry wounds in the back of Torey's head (People's exhibits Nos. 57 and 58), one photograph showing the entry wound to Versenia's head (People's exhibit No. 61), and one photograph showing the wound to her right forefinger (People's exhibit No. 64).  The four photographs were properly admitted.

Before trial, defendant filed a motion stating a general objection to the admission of "all evidence of photographs of the victims . . . [taken] after they were deceased" as irrelevant, cumulative, inflammatory, and prejudicial.  The motion identified no individual photographs and offered to stipulate to the victims' deaths and the location of their wounds.  But later, at the hearing to determine the admissibility of the particular photographs that the prosecutor sought to introduce, defense counsel only contended the autopsy photographs as a group were cumulative to the photos taken at the crime scene.  The only autopsy photographs the defense specifically objected to were two additional photographs:  one showing Versenia's face (People's exhibit No. 63) and the other a closer view of the wound to her forefinger (People's exhibit No. 65).  The court ruled that People's exhibits Nos. 57, 58, 61, and 64 were admissible but excluded exhibits  Nos. 63 and 65 as cumulative.  At the end of the guilt phase, however, exhibits Nos. 63 and 65 were

pronounced admitted by the court and given to the jury without objection by either party.**34**

As to People's exhibits Nos. 57, 58, 61, and 64, defendant has forfeited any claim that they were inflammatory and prejudicial. Although defendant's written motion made a general objection to *any* "bloody photos of the victims" as prejudicial and inflammatory , that objection was insufficient to preserve the issue for appeal because it did not identify any particular autopsy photograph, making it impossible for the court to "determine the evidentiary question in its appropriate context." (*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on another point by *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1; see also *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1172.) The autopsy photographs were not identified to the court until the hearing to determine their admissibility. At that hearing defense counsel failed to renew his specific objection to exhibits Nos. 57, 58, 61, and 64 as being prejudicial and inflammatory.

In any event, all of the admitted photographs were relevant to the prosecution's case and none were "so gruesome as to have impermissibly swayed the jury." (*People v. Smithey* (1999) 20 Cal.4th 936, 974.) In fact, the autopsy photographs depict cleaned wounds showing far less blood than photographs of the crime scene showing the position of the bodies. They were also not cumulative to the other photographs or other evidence. The autopsy photographs were the only evidence showing the nature and placement of the fatal wounds, and "[t]he prosecution was not obligated to 'accept antiseptic stipulations in lieu of photographic evidence.' " (*People v. Loker*, *supra*, 44 Cal.4th at p. 705, quoting

---

**34** Defendant does not make any contention on appeal regarding People's exhibits Nos. 63 and 65, and has, in any event, forfeited this claim.

*People v. Pride* (1992) 3 Cal.4th 195, 243.)  Moreover, the photograph showing the wound to Versenia's finger indicated she was in a defensive position just before she was shot, which was relevant to issues of malice and intent to kill. (*People v. Burney* (2009) 47 Cal.4th 203, 243.)

Finally, although the court, in contravention of its earlier ruling, admitted exhibits Nos. 63 and 65, their admission was of no significance.  Exhibit No. 63, the autopsy photograph of Versenia's face, showed blood flow across her face in virtually the same manner as exhibit No. 40, which was taken at the crime scene and admitted into evidence.  Exhibit No. 65, which was a closer view of Versenia's forefinger, was not misleading and was relevant because it corroborated testimony that her finger was "almost severed" by the bullet.  Although exhibits Nos. 63 and 65 may have had some overlap with other photos, they were neither confusing nor misleading.

### F.  Prosecutorial Misconduct in Guilt Phase Closing Argument

Defendant contends the prosecutor engaged in various acts of misconduct during his guilt phase closing argument in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.[35]  Defendant fails to show entitlement to relief.

---

[35]     " 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.'  [Citations.]  Under California law, a prosecutor who uses deceptive or reprehensible methods of persuasion commits misconduct even if such actions do not render the trial fundamentally unfair. [Citation.]  Generally, a claim of prosecutorial misconduct is not cognizable on appeal unless the defendant made a timely objection and requested an admonition. [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 444.)  In order to be entitled to relief under state law, defendant must show that the challenged conduct raised a reasonable likelihood of a more favorable verdict.  In order to be entitled to relief under federal law, defendant must show that the challenged conduct was not harmless beyond a reasonable doubt.  (*People v. Cook* (2006) 39 Cal.4th 566, 608.)

Defendant claims the prosecutor violated defendant's Fifth Amendment right to remain silent by making two references to statements defendant had made to Dr. Davenport during his 1996 competency evaluation.  In the first, the prosecutor stated defendant had claimed someone else had committed the murders and, according to Dr. Davenport, had "vehemently denied" guilt and had claimed "the masked men came in the house and did this."  Defense counsel interrupted, and said, "That's not it," and the court replied, "Sustained."  In the second, the prosecutor again mentioned that defendant had "vehemently denied the charges" to Dr. Davenport, but the jury would be able "to tell" the doctor "the truth of what [defendant] did that day —."  Defense counsel again interrupted with an objection to the form of the statement, but the court overruled the objection.

Defendant has forfeited this claim on appeal for several reasons.  First, as discussed *ante* at page 63, despite the immunity attached to such statements, defense counsel did not object when the prosecutor elicited defendant's competency statements from Dr. Davenport during cross-examination.  When evidence is admitted without objection, it is difficult "to fault the prosecutor for simply referring to [statements] that had been admitted by the court."  (*People v. Schmeck* (2005) 37 Cal.4th 240, 301.)  Second, defendant's objections during the prosecutor's closing argument were clearly not made on Fifth Amendment grounds.  Defense counsel's first objection of "[t]hat's not it" simply noted that defendant had never said the masked men had *committed* the murders, only that he saw them enter the house.  Defense counsel's second objection was to the form of the prosecutor's statement asking the jury to send a message to Dr. Davenport.  These objections failed to inform the court of the Fifth Amendment issue so it could consider the interest at stake and make a fully informed ruling.  (See *People v. Partida* (2005) 37 Cal.4th 428, 435.)  Third, defendant did not request an

71

admonition that the jury not consider defendant's statements to Dr. Davenport either at the time of the doctor's testimony or during the prosecutor's closing arguments. "Generally, a claim of prosecutorial misconduct is preserved for appeal only if the defendant objects in the trial court and requests an admonition, or if an admonition would not have cured the prejudice caused by the prosecutor's misconduct. [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) Defendant fails to show why an objection and admonition would have been futile.

Moreover, even assuming defendant has not forfeited this claim, and assuming the prosecutor's comments violated the immunity afforded to defendant's statements made during his competency examination, defendant fails to show prejudice. As discussed *ante* at page 63, the jury heard evidence that defendant tried to deny any culpability by blaming the murders on masked gunmen he saw enter his mother's house. Accordingly, the complained-of statements touched on other, properly admitted, remarks made by defendant. As explained in *People v. Noguera* (1992) 4 Cal.4th 599, 627, a claim of prejudice "is substantially undercut, however, by similar evidence in the record which is not challenged."

Defendant next argues the prosecutor improperly argued matters outside the record concerning Eva's memory and what she may have witnessed during the shootings. The prosecutor argued Eva had been traumatized by the murders, but suggested her inability to recall certain facts damaging to defendant's case in her preliminary hearing testimony was due to her bias as his mother. About her prior statements, the prosecutor suggested that "the only way [Eva] could have said the things she did is because she was able to figure out what happened inside the house." Defense counsel objected to these statements as improper or as referring to matters outside the record, but the court properly overruled the objections. It was not unreasonably speculative to argue that Eva was biased in favor of her son

72

or that she was able to conclude that defendant had shot the victims. The prosecutor's statements were "reasonable inferences or deductions that may be drawn from the evidence." (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 726.)

Defendant also takes issue with statements the prosecutor made during argument about whether defendant's family members had seen signs that he was mentally ill. First, the prosecutor claimed no one in defendant's family had seen signs of mental illness. In response to defense counsel's objection, the court corrected the prosecutor and said, "there were some people who said yes." Given that the court "promptly and properly corrected the erroneous statement of the prosecutor," any error was avoided. (*People v. Williams* (1988) 44 Cal.3d 883, 962.) The prosecutor also argued that defendant's family members did not know of defendant's mental health history because, according to Dr. Davenport's testimony, the treatment occurred while defendant was incarcerated. The defense unsuccessfully objected. Although Dr. Davenport did not specifically state that defendant's mental health records were mainly from his periods of incarceration, the doctor testified that he was relying on medical records provided by "Criminal Justice Mental Health." In addition, Elijah Blacksher testified that defendant had "spent the majority of his life in jail." The prosecutor's comment fell within the "wide latitude" of advocates "to make fair comment upon the evidence." (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 726)

Defendant also contends the prosecutor improperly suggested that defendant wanted "no part of the special circumstance" because "he knows what it means" and that he believed the defense was going to argue that defendant had committed the murders. But the court sustained defendant's objection that it was improper for the prosecutor to discuss what the defense might argue. In any event, we have never categorically prohibited a prosecutor from making fair comments

73

on anticipated trial strategy, and nothing said here portrayed defense counsel unfairly.  (See *People v. Wilson* (2005) 36 Cal.4th 309, 338-339; *People v. Davenport* (1995) 11 Cal.4th 1171, 1213; *People v. Davis* (1995) 10 Cal.4th 463, 538-539.)

Defendant next argues the prosecutor mischaracterized the record regarding defendant's Social Security disability payments, as reflecting a diagnosis of paranoid schizophrenia.  The prosecutor noted that the jury appeared unsettled when the defense introduced the document, and said, "we have no information available concerning [defendant's] medical condition or the names or addresses of his treating or diagnostic physician."  Defendant claims the prosecutor's comments mischaracterized the stipulation that accompanied the document, but, in fact, the prosecutor quoted the stipulation verbatim.  The stipulation made clear that the supporting documentation for the disability payments was unavailable.  The prosecutor properly emphasized what the stipulation made clear:  it was impossible to review how defendant was diagnosed or found to qualify for the disability payments.  Finally, defendant fails to show that the prosecutor improperly characterized the jury as being "unsettled" when the court read the lengthy stipulation for the Social Security records and then allowed the jury to review the one-page document, which cryptically lists only the dates and payment amounts defendant received.  In any event, the defense successfully objected to the description.  It is difficult to discern any possible prejudice.  Jurors surely knew whether they were "unsettled" or not and their lack of composure over a government document could not have unduly influenced the verdict.

**G.  Instructional Error Concerning Defendant's Mental State**

Defendant contends the court's instructions erroneously led the jury to believe it could not consider whether defendant's mental illness precluded him

74

from forming the intent to commit murder. Specifically, he claims the court's instruction on the presumption of sanity and the failure to give a requested pinpoint instruction hampered his mental illness defense and lowered the prosecution's burden of proof in violation of his due process rights.

The court properly instructed the jury that: "In the guilt trial or phase of this case, the defendant is conclusively presumed to have been sane at the time [] the offenses . . . are alleged to have been committed." Defense counsel did not object to this instruction and requested no further definition of sanity. Defendant now argues that this instruction effectively negated the defense that because of his mental illness he could not form the mental state required for murder. Yet the jury was given CALJIC No. 3.32, which is the standard instruction for this very defense.[36] As defendant acknowledges, we rejected an identical argument in *People v. Coddington* (2000) 23 Cal.4th 529, 584-585, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, footnote 13, and we are neither persuaded nor bound by any contrary decisions of the lower federal courts. (*People v. Avena* (1996) 13 Cal.4th 394, 431)

---

[36] The court instructed the jury with CALJIC No. 3.32 as follows: "You have received evidence regarding a mental disease, mental defect or mental disorder of the defendant at the time of the commission of the crime[s] charged in counts one and two or the lesser crimes thereto, namely, second degree murder and voluntary manslaughter. You should consider this evidence solely for the purpose of determining whether the defendant actually formed the required specific intent, premeditated and deliberated or harbored malice aforethought, which are elements of the crime charged in counts one and two, namely, first-degree murder; whether he formed the required specific intent or harbored malice aforethought, which are elements of the lesser crime of second-degree murder; or whether he formed the required specific intent, which is an element of the lesser crime of voluntary manslaughter."

Defendant also requested a pinpoint instruction similar to CALJIC No. 3.32 but with the addition that, if the jury believed defendant suffered from mental illness, then in order to find him guilty of first degree murder it must also be "convinced beyond a reasonable doubt that defendant did not act while under the influence of" his mental illness; if not so convinced, then the jury was required to conclude that the illness "negated the specific intent required for first degree murder." The court rejected this instruction, concluding it was "basically covered" by CALJIC No. 3.32.

Defendant's proposed instruction is both an incorrect statement of law, and confusing to the point of near incomprehensibility. Unlike CALJIC No. 3.32, the proposed instruction would have required the jury to *presume* that defendant's mental illness negated the mental state required for first degree murder if it was not convinced that he did not act under the influence of that mental illness. The mere fact that defendant acted under the influence of mental illness does not necessarily mean he lacked the required mental state. The question, as it is properly phrased in CALJIC No. 3.32, is "whether the defendant actually formed the required specific intent." This question is considered in the context of any evidence regarding mental illness. Defendant's proposed instruction would, in effect, have resurrected the defense of diminished capacity, a defense this state has long rejected. (§ 28, subd. (a) ["Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state . . . ."].)

To the extent defendant argues the proposed instruction was necessary to establish it was the prosecution's burden to prove beyond a reasonable doubt that defendant had the requisite mental state for first degree murder, other instructions conveyed the same point. No further instruction was required.

76

## H. Instructional Error on Manslaughter

The parties agree that the court erroneously instructed the jury that an intent to kill is a necessary element of voluntary manslaughter. Defendant argues the error denied him his federal constitutional right to due process and to correct instructions to support his theory of defense. There was no prejudicial error.

Murder involves the unlawful killing of a human being with malice aforethought, but a defendant who intentionally commits an unlawful killing without malice is guilty only of voluntary manslaughter. (*People v. Breverman* (1998) 19 Cal.4th 142, 153.) For purposes of voluntary manslaughter, an intentional unlawful killing can lack malice when the defendant acted under a " 'sudden quarrel or heat of passion' " or when the defendant acted under "[an] unreasonable but good faith belief in having to act in self-defense." (*Id*. at p. 154.) Two years after the trial here, in *People v. Lasko* (2000) 23 Cal.4th 101, we clarified that voluntary manslaughter may also apply where a defendant "acting with conscious disregard for life and knowing that the conduct endangers the life of another, *unintentionally* but unlawfully kills in a sudden quarrel or heat of passion." (*Id*. at p. 104.) We further explained that "the presence or absence of an intent to kill is not dispositive of whether the crime committed is murder or the lesser offense of voluntary manslaughter" (*id*. at p. 110) and that it was error to instruct the jury otherwise. (*Id*. at p. 111.) Accordingly, the trial court erred here when it instructed the jury that voluntary manslaughter requires a finding that the "killing was done with the intent to kill."

But there was no evidence supporting a manslaughter theory, let alone any theory of unintentional murder. Defendant repeatedly stated his intention to kill Torey days before the murders, and rejected pleas that he reconsider. According to Frances Blacksher, defendant also said if Versenia got in the way, he would kill

77

her, too.  Defendant had expressed dissatisfaction that Versenia's family was living in his mother's house and that Versenia had helped their mother obtain a restraining order against him.  These circumstances and the time over which defendant repeated his complaints are not consistent with heat of passion.

The brief duration between defendant's entry into the home and the firing of shots does not comport with a sudden quarrel and there was no evidence of such a quarrel.  The physical evidence showed that Torey was shot from behind, in his sleep.  Defendant does not articulate how Torey could have incited violence while he was asleep and facing away from defendant.  The fact that Versenia came to Torey's aid immediately thereafter could not constitute sufficient provocation to generate a sudden quarrel or heat of passion for purposes of voluntary manslaughter.  "Indeed, '[n]o case has ever suggested . . . that such predictable conduct by a resisting victim would constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter.' " (*People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1247, quoting *People v. Jackson* (1980) 28 Cal.3d 264, 306.)

Therefore, although the court gave a manslaughter instruction, defendant received a benefit to which he was not entitled and, by any standard, could not have been harmed by any error in failing to give *additional* manslaughter instructions setting forth the alternate voluntary manslaughter theory we described in *People v. Lasko*.  (See *People v. Steele* (2002) 27 Cal.4th 1230, 1253-1254.)

### I.  Instructional Error on Hearsay Evidence

Defendant contends the court erred by not giving the jury his two proposed pinpoint instructions concerning Eva Blacksher's hearsay statements, and that this error violated his state and federal constitutional rights to due process and to present a defense.  Specifically, he claims the instructions actually given deprived

78

his right to have the jury decide whether Eva had witnessed the shootings and whether her statements were spontaneous as a result. The claim is both forfeited and lacks merit.

Defendant's first proposed instruction would have told the jury that if the prosecution could not prove by a preponderance of the evidence that "Eva Blacksher was able to perceive the shooting of" the victims, then the jury could not consider in its deliberations her statements implicating defendant. His second proposed instruction stated that if the prosecution could not prove by a preponderance of the evidence that "Eva Blacksher actually made any statements implicating" defendant in the shootings, then the jury could not consider such statements in its deliberations. Both proposed instructions further cautioned the jury not to rely "upon such evidence, in whole or part, to convict the defendant unless the prosecution has proven the existence of the preliminary fact beyond a reasonable doubt."

On the record, the court acknowledged these proposed defense instructions, stated that it had conferred with defense counsel, and explained that counsel had agreed to a modified "special instruction" derived from the instruction for Evidence Code section 1240. This special instruction told the jury that Eva's statements were admitted as spontaneous statements, explained that such statements were admissible if they met the criteria for spontaneous statements, listed those criteria, and stated that, "Whether the declarant perceived the events described in the statements and the weight to which these statements are entitled is a matter for you to decide."

Given that defense counsel specifically agreed to substitute the instruction ultimately given to the jury for the ones they had previously requested, defendant has forfeited this claim. In any event, there was no error. The instruction given

79

properly told the jury to decide whether Eva had actually perceived the events described in her statements. Defendant, therefore, was not deprived of his right to have the jury determine this issue. (Evid. Code, § 403, subds. (b), (c)(1).)

Defendant also complains that the instruction given precluded the jury from determining whether Eva's statements were in fact spontaneous. This is not a jury question. A determination of "[w]hether the requirements of the spontaneous statement exception are satisfied . . . is vested in the court, not the jury." (*People v. Poggi*, *supra*, 45 Cal.3d at p. 318.) The only exception to this rule is where the preliminary fact establishing the admissibility of the evidence is also "a fact in issue in the action" because "it would be prejudicial to the parties for the judge to inform the jury how he had decided the same factual question that it must decide in determining the merits of the case." (Evid. Code § 405, subd. (b); Cal. Law Revision Com. com., reprinted at 29B pt. 1 West's Ann. Evid. Code (1995 ed.) foll. § 405, p. 377.) Whether Eva had personal knowledge of the facts contained in her statements was an issue for the jury, as they were properly told. Whether Eva's statements were spontaneous was not "a fact in issue in the action." (Evid. Code § 405, subd. (b).) The spontaneity of the statements was a legal question for the court to resolve. The instruction did not suggest the court had already decided that Eva's statements were accurate. There was no error.

## J. Cumulative Guilt Phase Error

Defendant argues we must reverse his conviction because of the cumulative effect of errors in the guilt phase of his trial. We assumed for the sake of argument that the prosecution improperly elicited statements from defendant's competency examination, but concluded that those statements were similar to defendant's other admissible statements in which he shifted blame for the murders. We also assumed for the sake of argument that it was error not to allow defendant's brother

80

to describe defendant's behavior as "paranoid," but concluded that this description would have been of marginal value and, given the extensive psychiatric testimony, its exclusion was not prejudicial. Considered cumulatively, the assumed errors described above could not have prejudiced defendant at the guilt phase.

## IV. SANITY PHASE

### A. Failure to Limit Cross-Examination of Defense Witness

Defendant faults the court for admitting, over his objection, Ruth Gades's testimony on cross-examination that, in light of her intervening 20 years of professional experience, she now doubted her original diagnoses of defendant in 1978 and 1980. Defendant argues that this cross-examination was irrelevant and prejudicial in violation of his federal constitutional rights to due process and a fair trial. We disagree.

On direct examination, Ruth Gades, who had a master's degree in psychology and was a licensed social worker, described her intake evaluations of defendant in 1978 and 1980 when he was involuntarily committed to Highland Hospital while incarcerated. Defense counsel asked Gades her diagnosis of defendant in each evaluation. In 1978, she concluded defendant suffered from psychotic depression with auditory and visual hallucinations and suicidal ideation. In 1980, she diagnosed him with psychotic depression.

On cross-examination, the prosecutor asked whether Gades would still give defendant the same diagnoses. Defense counsel objected on relevancy and foundational grounds,[37] but the court overruled the objection, stating, "You asked

---

[37] Respondent contends defendant failed to object below on the federal ground he now asserts, but the court had granted defendant's pretrial motion to "federalize" all his objections. In any event, the new federal arguments are based on factual or legal standards no different from those the trial court was asked to

*(Footnote continued on next page.)*

her what her opinion was, [the prosecutor] can certainly cross on that." Gades then explained that her intervening 20 years of experience would cause her to doubt whether defendant's hallucinations were genuine and that it was very common for inmates to exaggerate their symptoms to gain access to a mental health facility.

Although defendant claims he did not call Gades as an expert witness, defense counsel went beyond asking about her observations of defendant. He asked directly for her prior diagnosis and clinical impressions. Thus, the defense questions were clearly "directed toward medical expertise," going beyond mere lay opinion and into " 'a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Thornton* (2007) 41 Cal.4th 391, 449, quoting Evid. Code, § 801, subd. (a).) After the defense solicited Gades's prior diagnoses, opposing counsel was entitled to cross-examine the witness about what those diagnoses were based on and whether the expert witness remained confident in the accuracy of her conclusions. (See *People v. Smith* (2005) 35 Cal.4th 334, 359.) The cross-examination was proper.

## B. The Court's Biased Treatment of Counsel

Defendant again argues the court made inconsistent evidentiary rulings at the sanity phase that were biased in favor of the prosecution, in violation of his federal constitutional right to due process and a fair trial. Defendant argues the court treated the parties differently in allowing and disallowing certain questioning of defense witness Dr. William Pierce. Defendant also argues the court allowed

*(Footnote continued from previous page.)*

apply, and merely raise the additional legal consequence of violating the federal Constitution. "To that extent, defendant's new constitutional arguments are not forfeited on appeal." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

the prosecution to take advantage of its own discovery violation in cross-examining Dr. Pierce. There was no error.

As with his similar guilt phase claim (see *ante* at pages 65-68) defendant raised no objection below on the grounds he now raises on appeal, and thus has forfeited this claim. (*People v. McWhorter*, *supra*, 47 Cal.4th at p. 373.)

Even had the issue been preserved for appeal, the court's evidentiary rulings concerning Dr. Pierce's testimony were not inconsistent and there was no judicial misconduct.

Defendant faults the court for not permitting him to ask Dr. Pierce, over the prosecution's objections on grounds of speculation, whether defendant's mental health status would have been assessed and what would have happened to him had he been involuntarily committed on the night he was arrested for appearing at Eva's house with a baseball bat. Defendant also faults the court for allowing the prosecution to ask Dr. Pierce, over defense objections, how defendant would have acted if he were suffering from a psychotic episode at the time of the murders, whether the doctor believed there was a plausible reason why defendant went to Reno immediately after the murders, and whether defendant's telephone calls to his siblings immediately after the murders indicated he was lying to protect himself. Defendant also faults the court for allowing the prosecution to ask Dr. Pierce whether defendant intended to kill Torey, over the defense objection that the question called for a legal conclusion. These rulings were not inconsistent and are not evidence of judicial misconduct.

The defense questions concerning what would have happened to defendant or how he might have been diagnosed had he been involuntarily committed called for improper speculation. The prosecutor's questions, on the other hand, were not rooted in speculation, given that defendant had offered Dr. Pierce's expert opinion

83

that defendant had suffered numerous psychotic episodes in the past and was probably experiencing one the night he appeared at Eva's home with the baseball bat. On cross-examination, Dr. Pierce said he did not know for certain whether defendant was also suffering from a psychotic episode at the time of the murders, but stated that his examination of defendant and his past history indicated he "definitely has a potential to have psychotic episodes," and it was "very possible" defendant was in a psychotic state when he shot the victims.

As we have already noted, " 'the scope of cross-examination of an expert witness is especially broad' " and " 'a prosecutor may bring in facts beyond those introduced on direct examination in order to explore the grounds and reliability of the expert's opinion. [Citations.]' " (*People v. Loker*, *supra*, 44 Cal.4th at p. 739, quoting *People v. Lancaster*, *supra*, 41 Cal.4th at p. 105.) Given Dr. Pierce's opinions and his testimony that psychotic episodes severely disrupt cognitive functioning, the prosecutor's questions were all relevant to the question of whether defendant was suffering from a psychotic episode when the murders occurred. The court's rulings, therefore, were not inconsistent, but merely reflected the fact that cross-examination of expert witnesses is not narrowly circumscribed.

Finally, although the prosecution was late in disclosing a tape recording of defendant's statements to police, the recording was turned over before trial began. As a result, defense counsel had nearly three months to allow Dr. Pierce to listen to that tape before his appearance at the sanity phase. The doctor did not do so. Under the circumstances, there was nothing unfair in allowing the prosecutor to ask Dr. Pierce whether he had listened to that tape.

### C. Prosecutorial Misconduct

Defendant contends the prosecutor engaged in misconduct during his sanity phase closing argument in violation of his Sixth, Eighth and Fourteenth

Amendment rights under the United States Constitution. There was no prejudicial error.

We agree with defendant that the prosecutor committed misconduct by suggesting he did not call any experts at the sanity phase because it would have wasted the jury's time. In his opening statement for the sanity phase, the prosecutor claimed he intended to call "two mental health experts" to show that defendant was capable of planning and carrying out a course of action and was "goal oriented." But the prosecutor called no such witnesses during the sanity phase. In closing argument, the prosecutor said, "I really thought I was going to call two psychologists and two psychiatrists," but then explained that during the testimony of defense expert Dr. Pierce he had seen the jury "falling asleep, shuffling, waiting for him to close that book and stop this mess and come on up here and get real in 1998 instead of flashing back in the past in 1978." The prosecutor continued, "I said, man, if I put on any psychiatric testimony these people are going to kill me." Defense counsel interrupted and objected to the comment as "inappropriate and irrelevant," but the court overruled the objection stating, "It is all right." The prosecutor continued, claiming the jury would "have [his] head," so he "said no." The prosecutor further explained, "I don't think Dr. Pierce had anywhere to go, so I cut the case short and deal [*sic*] with him on the basis of his own testimony because he didn't get there."

To the extent the prosecutor claimed Dr. Pierce was not useful to defendant's case, his argument was permissible comment on the evidence. But the prosecutor also implied he had evidence that defendant was not insane, but did not want to bore the jury or waste its time with not just two, but four expert witnesses. This was improper. (*People v. Boyette* (2002) 29 Cal.4th 381, 452 [misconduct where the prosecutor suggested "she had evidence in her possession that supported

her line of questioning, but simply chose not to present it in the interest of saving the jury time"]; *People v. Hill* (1998) 17 Cal.4th 800, 829 [misconduct where the prosecutor told the jury, " 'I could have had somebody come in here and analyze [the alleged narcotics]' " (italics omitted)].)

But the error was not prejudicial on either state or federal grounds.[38] Defendant was unable to present any expert testimony supporting his claim of insanity at the time of the killings. At most, his expert testified that he "might" have been insane. Moreover, the court instructed the jury only to rely on evidence presented in court and not treat counsel's comments as evidence. (See *People v. Boyette*, *supra*, 29 Cal.4th at p. 453.) Under these circumstances, the prosecutor's improper remarks had little significance.

Defendant next contends the prosecutor referred to evidence outside the record when he argued that defendant's "hook into Social Security was his mother's disability of some kind." He claims this argument contravened the parties' stipulation that defendant had received disability payments due to a diagnosis of paranoid schizophrenia. But defendant ignores the fact that Ruth Cole had testified, without objection, that defendant did not want to work, wanted to "beat the system," and had his first exposure to disability payments as a teenager when his mother became disabled and could not work. The prosecutor made the comment not to undermine the stipulation but to argue that defendant was a "con man" who learned early on how to take advantage of "the system." This was permissible argument based on the evidence. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1059 ["The suggestion that defendant was a 'con man' was an

---

[38] See *ante* footnote 35.

86

appropriate comment, in colorful terms, upon the evidence to be introduced at trial"].)

Defendant argues the prosecutor in two instances improperly injected his personal beliefs into his closing arguments, but defense counsel made no objections to any of the comments of which he now complains. Defendant contends any objections would have been futile. But the record demonstrates that defense counsel had no hesitation in lodging objections to the prosecutor's closing arguments at either the guilt or sanity phases, and the court sustained many of defendant's objections. In any event, there was no misconduct.

Defendant first complains the prosecutor improperly maligned the credibility of defense expert Dr. Pierce by stating his belief that "the doctor looked ridiculous and didn't make any sense." But the prosecutor prefaced these remarks by explaining that Dr. Pierce's opinion was based in part on information provided by defendant, which he argued was untrustworthy. This was permissible argument based on the evidence. (*People v. Pinholster* (1992) 1 Cal.4th 865, 948 [A prosecutor may argue "that defense witnesses are not entitled to credence . . . [and] argue on the basis of inference from the evidence that a defense is fabricated"].)

Defendant also complains the prosecutor improperly injected his personal beliefs by stating he did not "like the way it invaded your province when [defendant] sat in court and laughed" while Deputy District Attorney Richard Moore testified about defendant's statements to police. Counsel called defendant's behavior "cold" and "wrong." Defendant claims there was no indication the jury actually saw this conduct. But the prosecutor mentioned he was "glad [the jury] saw it," and the fact that defendant did not object to this line of argument suggests defendant's behavior was readily observable during Moore's testimony. Moreover, defense counsel, in his closing arguments at the sanity phase, likewise

87

noted the jury was witness to bouts of defendant's inappropriate laughter during the course of the trial. The prosecutor, therefore, was addressing what had transpired during trial, not merely describing his personal belief as to defendant's demeanor.

It is misconduct, however, for a prosecutor to comment on a nontestifying defendant's courtroom demeanor or behavior during the guilt phase of the trial. (*People v. Heishman* (1988) 45 Cal.3d 147, 197; *People v. Smith* (2007) 40 Cal.4th 483, 524; *People v. Boyette*, *supra*, 29 Cal.4th 381, 434.) We have refused to apply this rule during the penalty phase when a defendant's character is placed in issue as a mitigating factor. "Under those circumstances it was proper for the jury to draw inferences on that issue from their observations of defendant in the courtroom and therefore proper for the prosecutor to base a closing argument on such observations." (*People v. Heishman*, *supra*, 45 Cal.3d at p. 197.)

This exception applies even more strongly here because defendant's demeanor was a significant issue in determining his sanity. In particular, according to Dr. Levin, defendant's propensity to laugh inappropriately during his prior examinations and hospitalizations was a symptom relevant to his previous diagnoses of mental illness. As already discussed, defense counsel raised this very issue during closing argument and referred to defendant's "inappropriate laughter" and "bizarre" demeanor during the trial. Given the circumstances, the prosecutor made fair comment on defendant's demeanor.

### D. Cumulative Sanity Phase Error

The only error we have identified during the sanity phase was the prosecutor's suggestion that he could have called four experts in his favor, but did not do so in order to save the jury's time. We concluded the error could not have

been prejudicial. Consequently, there is no cumulative effect of sanity phase error to consider in this case.

## V. PENALTY PHASE

### A. Victim Impact Evidence

Members of the Blacksher family testified about the lasting effects of the murders on their lives. (See *ante*, at p. 18.) Defendant contends the admission of this evidence violated his state and federal rights to due process and a reliable penalty determination. We have previously rejected the contention that section 190.3, factor (a) is unconstitutionally vague as to the scope of admissible victim impact evidence, and we reject defendant's further claim that such evidence should be limited to: (1) testimony by family members who were personally present at the scene during or immediately after the killing; (2) circumstances known or reasonably foreseeable to the defendant; and (3) the testimony of a single witness. (*People v. Dykes* (2009) 46 Cal.4th 731, 783.)

Defendant further argues that family members should not have been able to testify as to the financial impact of the murders and the lasting effects of the murders on their emotional and employment lives. Defendant made no specific objection to this testimony below. Even assuming he has not forfeited this claim, the complained-of testimony did not invite "a purely irrational response from the jury," nor was it " 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' " (*People v. Lewis and Oliver, supra,* 39 Cal.4th at pp. 1056-1057.) We have previously found similar testimony relevant to the impact of defendant's crimes. (*People v. Jurado* (2006) 38 Cal.4th 72, 131-134, and cases cited therein.)

### B. The Exclusion of Mitigating Evidence

Defendant argues the trial court erred in sustaining the prosecutor's objections to questions he posed to his sister, Georgia Hill, about what other family

89

members knew of defendant's mental problems. He also faults the trial court for sustaining the prosecution's objection to the question of whether Sammie Lee, Versenia's former husband, believed that the Blacksher family had "seen enough death." He claims the rulings excluded potential mitigating evidence in violation of his rights to present a defense, to confront witnesses, to due process, and to a reliable sentencing determination under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. There was no prejudicial error.

When defense counsel tried to ask Georgia what she thought her older siblings did not understand about defendant or why they hated him, the court sustained the prosecution's objections as calling for speculation. The court did not abuse its discretion in so ruling. Georgia's belief as to what her older siblings thought, or why they thought so, was speculative. (Evid. Code, § 702, subd. (a).) Moreover, at issue was whether the older siblings wrongly believed that defendant suffered no mental illness. Thus, her belief as to that issue was not relevant unless supported by adequate foundation. In any event, defendant made no argument to support the admissibility of this evidence; he likewise fails to do so on appeal. The evidentiary rulings were proper. (*People v. Morrison*, *supra*, 34 Cal.4th 698, 724.)

The court also sustained objections to Georgia's characterizations of defendant as behaving in a "schizophrenic" manner on the ground she was not qualified to give a medical conclusion. Although the term "schizophrenic" carries a technical psychiatric meaning, it also has a common or ordinary meaning as an adjective describing "contradictory or antagonistic qualities or attitudes." (Merriam-Webster's Collegiate Dict. (10th ed. 1998) p. 1041.) Defendant made no effort to clarify which meaning Georgia relied upon. Even assuming a cognizable error, there was no conceivable prejudice. Georgia was allowed to describe in detail her observations of defendant's odd behavior. The mere fact that

90

she was not allowed to label that odd behavior as "schizophrenic" could not have affected the verdict, especially in light of all the other evidence on this topic.

Finally, when Defense Counsel Thomas Broome asked Sammie Lee if he felt "this family has seen enough death," the court properly sustained the prosecutor's objection on relevancy grounds. The question was vague and called for speculation. Although the defense may elicit opinions from a capital defendant's family members about the appropriate punishment (*People v. Lancaster, supra,* 41 Cal.4th 50, 98; *People v. Mickle* (1991) 54 Cal.3d 140, 194), the question posed to Sammie was not phrased in this manner. If defense counsel wanted to ask Sammie whether he believed defendant should be put to death, he had the opportunity to rephrase his question more clearly. He did not.

Given our analysis of the above described rulings, we reject the further contention that the court's rulings demonstrated an "asymmetrical application" of the rules of evidence in violation of defendant's due process rights. In any event, defendant forfeited this claim for appellate purposes by failing to raise it below. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 414.)

### C. Prosecutorial Misconduct

Defendant contends the prosecutor engaged in misconduct during his penalty phase arguments in violation of his Sixth, Eighth, and Fourteenth Amendment rights under the federal Constitution. There was no error.

Defendant first contends the prosecutor committed misconduct during his penalty phase opening statement by referring to the expected testimony of Dr. Joel Fort, who ultimately did not testify. The defense made a relevancy objection just before opening statements began. The court did not rule on the objection until after the prosecutor had made his opening statement. Hence, the prosecutor did not engage in misconduct by referring to the anticipated testimony. Moreover, all

91

the prosecutor said about Dr. Fort was that he had reviewed "some materials," would testify as to defendant's state of mind at the time of the murders, and "[h]is opinion will not be in any way related to paranoid schizophrenia." After the court ruled Dr. Fort's testimony inadmissible, the parties agreed to a curative instruction in which the court informed the jury that the prosecutor had intended to call Dr. Fort as a witness, but the court changed its ruling so the prosecutor would no longer be calling him. The court further warned the jury not to speculate about Dr. Fort's testimony or why he would not be testifying. It also instructed the jury not to discuss these matters or allow them to be part of the deliberations. Under the circumstances, there was no misconduct.

Defendant next argues that the prosecutor made several improper arguments concerning remorse at the penalty phase closing argument. "A prosecutor may properly comment on a defendant's lack of remorse, as relevant to the question of whether remorse is present as a mitigating circumstance, so long as the prosecutor does not suggest that lack of remorse is an aggravating factor." (*People v. Mendoza* (2000) 24 Cal.4th 130, 187.)

Defendant argues it was improper for the prosecutor to comment, over his objection, that defendant's emotionless courtroom demeanor showed he had a "heart of ice," but since defendant placed his own character at issue as a mitigating factor and asked for the jury's compassion and sympathy, the argument was proper. (*People v. Navarette* (2003) 30 Cal.4th 458, 519; *People v. Heishman*, *supra*, 45 Cal.3d 147, 197.) Defendant also takes issue with the prosecutor commenting that after the murders defendant ate a "full breakfast of eggs, coffee, sausage and French toast and finished it off with a cigarette" while the victims bled to death. But defendant made no objection to the prosecutor's comments, and we have found similar arguments in other cases to be fair comment on the

92

evidence.  (*People v. Bennett* (2009) 45 Cal.4th 577, 613 [prosecutor did not improperly introduce evidence of defendant's lack of remorse where defendant bought a new car and took his wife out for a "romantic dinner" after the murders]; *People v. Box* (2000) 23 Cal.4th 1153, 1215 [prosecutor did not improperly argue lack of remorse in pointing out that the defendant ate at a fast food restaurant after the murders].)  Defendant also complains the prosecutor offered a statement he never made, "They can drop dead.  I won't care.  I am hungry and I have to have something to eat . . . ."  But again, defendant did not object, and "[t]he imagined statements by [defendant] were no more than sarcastic hyperbole identifying what the prosecutor believed to be weakness in the defense explanation of the events." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1303, fn. 48.)  Defendant argues the prosecutor improperly commented, over his objection, on defendant's claim to police about having a "beautiful relationship" with the victims and his claim that he last saw Torey asleep and smiling.  But we have allowed similar arguments that a defendant's untruthfulness and evasiveness demonstrated a lack of remorse. (*People v. Boyette*, *supra*, 29 Cal.4th 381, 455; *People v. Holt* (1997) 15 Cal.4th 619, 691.)  Finally, nothing in the prosecutor's argument asked the jury to consider lack of remorse as an aggravating factor.

Defendant faults the prosecutor for repeatedly arguing in the penalty closing argument that there was no evidence in mitigation.  He claims, to the contrary, the record contained mitigating evidence and the prosecutor's argument was tantamount to an expression of his own personal belief and reference to matters outside the record.  Although defendant objected to some of these comments , the objections were properly overruled as the remarks were fair comment on the evidence and were consistent with the prosecutor's claim that defendant did not suffer from any mental illness.  (*People v. Farnam, supra,*  28 Cal.4th 107, 200

93

[prosecutor made fair comment on the evidence by describing defendant's "case in mitigation as 'garbage,' 'a scam,' 'obvious ploys,' 'lies,' 'baloney,' and 'a fairy tale' "].)

Defendant contends the prosecutor on two occasions engaged in "paraleipsis:" stating one thing but suggesting the opposite. (See *People v. Wrest* (1992) 3 Cal.4th 1088, 1107.) Although defendant objected to the remarks, the court properly overruled the objections. On the first occasion, the prosecutor described defendant's assault on a fellow inmate and argued that the incident, in light of defendant's prior convictions, suggested a pattern of "violence escalating"; the prosecutor, however, corrected himself and said, "I'm not going to comment on this again, because I've already referred to it as a prior felony conviction and you can't double count." When defense counsel objected, the prosecutor again repeated, "You can't double count," and asked the jury to "consider this one time and that's all." There was nothing misleading in the prosecutor's statements, which merely clarified a passing reference to defendant's record of prior convictions. On the second occasion, the prosecutor described defendant's rape and beating of his ex-girlfriend and the effect of the murders on his brother, Artis Blacksher, Jr. The prosecutor noted that defendant's crimes had made each witness so angry at defendant that they wanted to kill him. Defense counsel objected, stating that Artis had only said he wanted to hurt defendant after the murders, not kill him. After the court overruled the objection, the prosecutor argued that it would not be fair for the jury to base its decision on anger, and although they were mad at defendant, "[a]nger is not an appropriate basis for any decision in this case." Defense counsel made no objection to these remarks and, even assuming the contention was not forfeited for appeal, the prosecutor was merely describing the impact of defendant's crimes, while also making clear that

94

the jury should not let its anger permeate its decision making. In sum, the complained-of comments were not improper. (See *People v. Valencia* (2008) 43 Cal.4th 268, 281-282.)

Last, defendant claims the prosecutor injected into closing arguments his personal belief regarding deterrence and the benefit of his own experience as a prosecutor for "many, many years." Not so. Defendant did not object to any of the statements he now challenges and thus has forfeited these contentions. Moreover, they lack merit. The prosecutor did not argue that his own experience made him believe that death was an appropriate penalty in this case. Instead, he said that, in his experience, juries can sense insincerity; as a result, he had learned humility and restraint and he was not simply going to assume that the jury would do as he asked. We have never faulted a prosecutor for simply declaring his or her humility. The prosecutor also suggested that the murders had caused the community to suffer "a wound as a body" and that a death sentence for defendant would be "a cleansing" and "a catharsis" that would restore "order and continuity to what we have." These statements do not address deterrence, but rather community retribution. We have permitted similar brief statements in other cases. (See *People v. Martinez* (2010) 47 Cal.4th 911, 965-966; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1178.)

**D. Instructional Error**

Defendant claims the court made various instructional errors in violation of his federal constitutional rights to due process and a reliable sentencing determination. No prejudicial error occurred.

Defendant correctly contends the court failed to reinstruct the jury during the penalty phase on the applicable principles of evaluating the credibility of witnesses found in CALJIC Nos. 2.20, 2.22, 2.23, and 2.21.1.[39] Although the court erred, the omission was not prejudicial.

A trial court has a sua sponte duty to "instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case," including instructions relevant to evaluating the credibility of witnesses. (*People v. Carter* (2003) 30 Cal.4th 1166, 1219 (*Carter*).) In *Carter*, not only did the court fail to give the instructions relevant to assess the credibility of witnesses, it also failed to instruct at the penalty phase with any of the applicable evidentiary instructions from CALJIC Nos. 1.00 through 3.31. (*Carter*, at pp. 1218-1219.) As here, the court in *Carter* had specifically told the jury to disregard all other instructions given in the prior phases of the trial. We assumed error in *Carter*, but concluded the error was harmless beyond a reasonable doubt because, at least as to those omitted instructions regarding the credibility of witnesses, "the jury expressed no confusion or uncertainty in this regard and never requested clarification." (*Id*. at p. 1221.) The same is true here.

Defendant identifies only one way in which the failure to instruct allegedly prejudiced him. He claims that the testimony of his ex-girlfriend, who claimed defendant had raped and beaten her, was allowed to go before the jury

---

[39]  Defendant below made no request for these instructions.

"unimpeached" because it was not instructed to consider her prior felony convictions in assessing her credibility. (CALJIC No. 2.23.) Of course, it is not the role of any instruction to "impeach" or advocate. Defendant had an ample opportunity to cross-examine the witness and made no effort to impeach her version of events. There was no evidence she testified in exchange for any reward or immunity in relation to her prior criminality, which was in evidence. Her testimony was detailed, vivid, and appeared otherwise credible. In these circumstances, her prior convictions were of marginal impeachment value. Finally, given that counsel for both parties strongly argued the credibility of certain witnesses in their penalty phase closing arguments, defendant simply cannot argue that the jury was "adrift" when it came to evaluating the credibility of the witnesses at the penalty phase.

Defendant, therefore, fails to establish a reasonable possibility that any error under state law affected the verdict. We also conclude it appears beyond a reasonable doubt that the error did not contribute to the verdict of death under the federal standard of review of constitutional error. (*Carter*, *supra*, 30 Cal.4th at pp. 1221-1222.)

Defendant argues the court erred by refusing to give his requested instruction that the jury should not "double-count" the special circumstances against him as aggravating factors relevant to the circumstances of the crime under section 190.3, factor (a). But we have rejected identical claims, concluding that, in the absence of any misleading argument to encourage double-counting, the " 'standard instructions do not inherently encourage the double counting of aggravating factors. [Citations.]' " (*People v. Ayala* (2000) 24 Cal.4th 243, 289, quoting *People v. Barnett* (1998) 17 Cal.4th 1044, 1180; see also *People v. Young* (2005) 34 Cal.4th 1149, 1225-1226.) Here, the prosecutor made no such argument

97

and only encouraged the jury to consider the circumstances that defendant had murdered members of his own family; premeditated the crimes for nearly a week; and exploited the victims' vulnerability by shooting Torey while he was asleep and Versenia when she came to her son's aid. There was no need to clarify the standard instructions.

Defendant contends the court erred by refusing to instruct the jury with a proposed instruction directing the jury to consider: (1) whether defendant committed the offenses while "under the influence of any mental or emotional disturbance;" and (2) whether defendant's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, regardless of whether the capacity was so impaired as to constitute a defense to the charges, and regardless of whether the impairment caused him to commit the crimes." He claims the failure to instruct the jury regarding these two factors violated his federal constitutional rights to present a defense and to a fair trial under the Sixth Amendment, his right to a reliable sentencing determination under the Eighth Amendment, and his right to due process under the Fourteenth Amendment.

Defendant argues his proposed first factor was necessary because the standard CALJIC No. 8.85 instruction, given to the jury here, unconstitutionally restricted the jury to consideration of only "extreme" mental or emotional disturbances.[40] We have repeatedly rejected identical arguments, and do so again. (*People v. Bramit* (2009) 46 Cal.4th 1221, 1249; *People v. Anderson* (2001) 25 Cal.4th 543, 601; *People v. Davenport*, *supra*, 11 Cal.4th 1171, 1230.)

---

[40] Defendant did not make this specific argument below, but as this claim attacks the validity of the death penalty statute, it "may be raised at any time." (*In re Clark* (1993) 5 Cal.4th 750, 765, fn. 4.)

The second proposed factor differs from the standard instruction, which was given, only in that it directs the jury to consider the defendant's mental impairment even if it did not constitute a legal excuse or did not cause the crimes to occur. But we have rejected claims the standard instruction is insufficient for failing to state that the mental impairment may be considered even if it did not influence the commission of crime. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1179; *People v. Riel*, *supra*, 22 Cal.4th 1153, 1225.) Furthermore, the court gave the "catchall" instruction under section 190.3, factor (k), which directs the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime, even though it is not a *legal excuse* for the crime." (Italics added.) "This instruction was sufficient to advise the jury of the full range of mitigating evidence." (*People v. Sully* (1991) 53 Cal.3d 1195, 1245, citing *People v. Easley* (1983) 34 Cal.3d 858, 878, fn. 10.)

### E.  Unconstitutionality of the Death Penalty Statute

Defendant raises numerous constitutional challenges to California's death penalty law, all of which we have repeatedly rejected for lack of merit.

California's death penalty law "adequately narrows the class of murderers subject to the death penalty" and does not violate the Eighth Amendment. (*People v. Loker, supra,* 44 Cal.4th 691, 755.)

Section 190.3, factor (a), allowing the jury to consider the circumstances of the crime, does not result in the arbitrary or capricious imposition of the death penalty. (*People v. Stevens* (2007) 41 Cal.4th 182, 211.)

The death penalty law is not unconstitutional because it does not require juror unanimity on the aggravating circumstances or provide a specific burden of proof for aggravating factors. Nor is the law unconstitutional because it does not require that the jury find that aggravating factors outweigh mitigating factors or that death is the appropriate penalty under any specific burden of proof. (*People v.*

99

*Loker*, *supra*, 44 Cal.4th 691, 755.)  The United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Blakely v. Washington* (2004) 542 U.S. 296 do not compel a different result.  (*Loker*, at p. 755.)

A jury in a capital case is not required to make written findings.  (*People v. Stevens*, *supra*, 41 Cal.4th 182, 212.)

Intercase proportionality review is not required under either the state or federal Constitutions.  (*People v. Loker*, *supra*, 44 Cal.4th at p. 755; *People v. Crittenden* (1994) 9 Cal.4th 83, 156-157.)

A penalty phase jury may consider a defendant's unadjudicated criminal activity and need not agree unanimously or beyond a reasonable doubt that the defendant committed the unadjudicated crimes.  (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1059; *People v. Hoyos* (2007) 41 Cal.4th 872, 927.)

The use of restrictive adjectives, such as "extreme" and "substantial," in section 190.3's list of potential mitigating factors does not render it unconstitutional.  (*People v. Stevens*, *supra*, 41 Cal.4th at p. 213.)

A penalty phase jury need not be instructed as to which factors are aggravating and which are mitigating or to restrict its consideration of evidence in this regard.  (*People v. Barnwell*, *supra*, 41 Cal.4th 1038, 1059; *People v. Brown*, *supra*, 33 Cal.4th 382, 402.)

Capital defendants and noncapital defendants are not similarly situated; therefore, the death penalty law does not violate equal protection or the Eighth Amendment by denying capital defendants various procedural rights given to noncapital defendants.  (*People v. Loker*, *supra*, 44 Cal.4th at p. 756.)

Finally, we again reject the contention that the death penalty violates international law, is contrary to international norms, or that these norms require the

100

application of the death penalty to only the most extraordinary crimes.  (*People v. Martinez*, *supra*, 47 Cal.4th 911, 968.)

## VI.  PRESENTENCING ISSUES

### A.  Failure to Conduct a Second Competency Hearing

Defendant contends the court violated his federal right to due process because it lacked jurisdiction to sentence him without holding a second competency hearing or making an express finding that defendant was competent to be sentenced.  He also claims the court ignored new evidence that cast doubt on defendant's competency.  We disagree.

Before sentencing, on November 2, 1998, defense counsel declared a second doubt as to defendant's competency, claiming defendant appeared not to understand the proceedings during their last two meetings.  The court stayed the proceedings and appointed two doctors to evaluate defendant.  Both doctors, however, were unable to examine defendant because he refused to leave his cell.  At the December 7, 1998 appearance, the court noted defendant's refusal to cooperate with the court-appointed doctors and invited defense counsel to make a written submission concerning whether the court, under the circumstances, could proceed with sentencing.  The court also stated it had given counsel "three cases that go to that issue."  Defense Counsel Thomas Broome replied that he intended to brief whether defendant should be represented by independent counsel because of the conflict between defendant and himself regarding defendant's mental condition.

Before adjourning, the court allowed defendant to address the court.  Defendant complained that his attorneys had not clearly explained the consequences of his plea of not guilty by reason of insanity and described his disagreement with some of the court's pretrial evidentiary rulings.  Defendant

insisted he did not harm his sister or nephew. He appeared to believe that his plea of not guilty by reason of insanity was tantamount to an admission of guilt of the murders, stating that if his counsel had explained to him that he "had to admit to two counts of murder of my nephew and sister, no, there would have been no sanity trial." Defendant was particularly upset that the prosecutor had accused defendant of malingering — a term that defendant equated with "slander," denigration, and racism.

On January 25, 1999, the court denied defense counsel's motion to appoint independent counsel for defendant and set the matter for sentencing. At no point did the court expressly reinstate the proceedings or make any ruling or finding as to defendant's competency, and defense counsel made no objection on this ground before sentencing. On February 9, 1999, the court sentenced defendant to death.

In *People v. Medina* (1995) 11 Cal.4th 694, we concluded the court properly declined to hold a second competency proceeding because the defendant had refused to cooperate with the court-appointed experts, and, consequently, "there was no new evidence to introduce at a second hearing . . . ." (*Id.* at p. 734.) We concluded the defendant's "noncooperation did not, under the circumstances, constitute substantial evidence of a change in circumstances necessitating a new hearing." (*Ibid.*) We also rejected the claim that the court's decision to appoint experts automatically and irrevocably triggered the need for a formal competency hearing because the defendant had the burden of proving his incompetency and, without new information, "holding another competency hearing would be pointless." (*Id.* at p. 735.)

Although the court here did not expressly find an absence of substantial new evidence regarding competence, at the December 7, 1998 court appearance, it expressly noted defendant's noncooperation with the court-appointed doctors.

102

Thus, the court was obviously aware that the defense had no new evidence regarding defendant's competence. Although the court did not expressly reinstate the proceedings, it had previously invited defense counsel to brief the issue of whether sentencing could proceed and the court gave counsel case law that was directly relevant to this issue. The court, therefore, was aware of the jurisdictional issue. In all, the court's actions in proceeding with sentencing revealed the obvious — that defendant failed to present a change in circumstances necessitating a new competency hearing and that the court was reinstating the proceedings and moving forward with the sentencing. The court's actions could not be reasonably interpreted any other way.[41]

Defendant acknowledges *Medina*, but attempts to distinguish it. He argues that the court here had before it substantial evidence of changed circumstances, in the form of defendant's statements to the court on December 7, 1998. Defendant argues his complaints to the court about his plea showed he did not understand the proceedings and his statements reflected his inability to assist in his defense.

But defendant's confusion regarding his plea did not necessarily amount to an inability to assist in his defense. Under section 1016, "[a] defendant who pleads not guilty by reason of insanity, without also pleading not guilty, thereby admits the commission of the offense charged." A defendant "is wholly free to prevent that result by merely making the *additional* plea of not guilty." (*People v. Walker* (1948) 33 Cal.2d 250, 262, italics added.) Defendant entered both such pleas, albeit with some confusion. The legal subtleties implicated by these different

_____

[41]    The Attorney General argues defendant abandoned the competency issue by not objecting to the court's action. However, determining competency "is jurisdictional, and cannot be waived by counsel." (*People v. Hale* (1988) 44 Cal.3d 531, 541.)

103

pleas would confuse most laypersons. The entry of both pleas means that, as a matter of law, defendant's insanity plea did not function as an admission of guilt. Moreover, the fact defendant appeared to understand the significance of a single plea of not guilty by reason of insanity indicated he had the ability to grasp the legal consequences of his plea.

Finally, although at times defendant did ramble in his statements to the court, at other times he was direct and fairly eloquent. Furthermore, defendant's predilection to use "bizarre verbiage" was nothing new to the court, as documented in defendant's medical records. In sum, given the deference accorded to a trial court's decision on whether to hold a competency hearing, defendant's statements to the court did not constitute substantial evidence of a change in circumstances requiring a second competency hearing. (*People v. Marshall*, *supra*, 15 Cal.4th 1, 33 ["More is required than just bizarre actions or statements by the defendant to raise a doubt of competency" requiring a second hearing].)

### B. Refusal to Appoint Independent Counsel

Defendant contends the court erred and denied him due process by failing to address an alleged conflict between himself and defense counsel that arose after defense counsel declared a second doubt as to his competency. Defendant claims the court should have resolved this alleged conflict either by appointing independent counsel to represent him or by allowing defendant to testify as to his competence and allowing his counsel to offer evidence of his incompetence. We disagree.

As noted *ante*, at page 101, before sentencing defense counsel declared a conflict when defendant refused to be examined by the court-appointed doctors. Counsel asked the court to appoint independent counsel to resolve the conflict and to represent defendant on the issue of his sanity. The court denied the motions.

104

Defendant relies on *People v. Stanley* (1995) 10 Cal.4th 764 (*Stanley*) to argue that the appointment of independent counsel was required. The reliance fails. *Stanley* involved the inverse situation from that encountered here. In *Stanley*, we held that the *appointment* of independent counsel for a defendant in a competency proceeding did not violate his due process rights, where a conflict arose between the defendant and his original trial counsel about the presentation of mitigating evidence at the penalty phase. This conflict prompted original counsel to declare a doubt as to the defendant's competency, to which defendant objected. The trial court, without objection by any party, appointed independent counsel, in addition to defendant's original counsel, to represent defendant at his competency hearing. At that hearing, the prosecutor and the independent counsel argued that defendant was competent, and original trial counsel argued he was not. The trial court subsequently found defendant competent, and defendant ultimately allowed his original counsel to present the disputed mitigating evidence. (*Id.* at pp. 803-807.)

In *Stanley*, we rejected the claim that the defendant's simultaneous representation by two lawyers arguing conflicting points of view amounted to a violation of his due process rights. We explained the trial court was confronted "with a complex situation" and by "appointing separate counsel to represent defendant's point of view, the trial court acted to resolve a conflict, not create one." (*Stanley*, *supra*, 10 Cal.4th at p. 806.) We noted that "the jury [heard] every side of the issue of defendant's competence, thereby assuring defendant a fair trial." (*Id.* at pp. 806-807.) We acknowledged that, under the circumstances, the defendant "perhaps got more than he was entitled to," but we were "unable to conclude he thereby was denied due process." (*Id.* at p. 807.)

105

*Stanley* permits but does not *mandate* the appointment of independent counsel when defense counsel and a defendant disagree on the defendant's competency. Moreover, unlike the present case, the conflict in *Stanley* was not restricted to defendant's competency "because the root of the problem was defendant's refusal to permit mitigating evidence . . . ." (*Stanley*, *supra*, 10 Cal.4th at p. 806.) Accordingly, *Stanley* did not compel the trial court to appoint independent counsel to represent defendant with respect to possible competency proceedings.

The Attorney General argues that the appointment of independent counsel was unnecessary because any "conflict" here was illusory, reasoning that counsel does not act against a defendant's interest in pursuing a finding of incompetency even if it is against the defendant's wishes. We have previously articulated this same proposition, limiting its application to the stage where "there has been a prima facie showing of incompetence . . . ." (*Stanley*, *supra*, 10 Cal.4th at p. 804; *People v. Samuel* (1981) 29 Cal.3d 489, 495 ["a section 1368 hearing is held only after there has been a prima facie showing of mental incompetence. Of necessity, therefore, defendant's attorney must play a greater role in making fundamental choices for him, and cannot be expected to seek approval of strategic decisions made in the course of obtaining and presenting proof of incompetence"]; see also *Shephard v. Superior Court* (1986) 180 Cal.App.3d 23, 29 ["The rationale giving competent defendants ultimate authority over tactical decisions at trial, does not extend to this situation where defense counsel's duty to protect a prima facie mentally incompetent defendant requires contravening that defendant's tactical preferences"]; *People v. Jernigan* (2003) 110 Cal.App.4th 131, 136 ["To permit a prima facie incompetent defendant to veto counsel's decision to argue that the client is incompetent would increase the danger that the defendant would be

106

subjected to criminal proceedings when he or she is unable to assist counsel in a rational manner"].) **42** In these cases, counsel's duty to argue the defendant's best interests, regardless of the defendant's actual wishes, was triggered by the discovery of substantial evidence of the defendant's incompetency.

But, counsel's mere opinion that defendant might be incompetent, without more, did not constitute substantial evidence of his incompetency. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1111-1112.) Given that a defendant is presumed competent and the burden is on the defense to prove otherwise (*People v. Medina*, *supra*, 51 Cal.3d 870), a defense attorney may be presented with a difficult situation if he or she genuinely believes a defendant is incompetent but the defendant refuses to cooperate in marshalling evidence of his condition. This case is further complicated by evidence that defendant may have previously engaged in malingering.

Even if we were to assume error, defendant fails to explain how the appointment of independent counsel would have either alleviated the alleged conflict or would have otherwise resulted in a more favorable outcome. Defendant consistently maintained that he did not shoot the victims. He may have been somewhat unclear about all the legal intricacies of an insanity plea. He correctly understood, however, that such a plea, standing alone without an accompanying not guilty plea, would acknowledge that he had, indeed, fired the fatal shots. It was to this acknowledgment that he objected. Defendant refused to participate in any further competency proceedings, and nothing in the record indicated his

---

**42** All of these cases used the term "prima facie" where substantial evidence of incompetency existed either in the form of an expert's evaluation that the defendant was incompetent or where the trial court independently declared a doubt as to the defendant's competency.

107

refusal was uniquely tied to his defense counsel. Even if the court had appointed independent counsel, it is speculative to assume defendant would have cooperated with new counsel and allowed the doctors to evaluate him. Moreover, it is also speculative to assume that the results of any competency evaluation would have been favorable to defendant.

Finally, defendant complains that the alleged conflict could have been resolved by the procedure described in *People v. Bolden* (1979) 99 Cal.App.3d 375. There, the defendant and his counsel disagreed as to his competence. Counsel resolved this dispute by allowing the defendant to testify as to his own competence and defendant allowed defense counsel to present a psychiatrist to testify to the contrary. But the procedure in *Bolden*, which reflected a compromise between client and counsel, was uniquely tailored to the presentation of evidence at a competency trial. As with the procedure employed in *Stanley*, we have never suggested that the *Bolden* procedure was mandatory under any circumstance.

### C. Cumulative Error Affecting the Reliability of Defendant's Sentencing Determination

Defendant finally contends that the collective impact of errors during all phases of the proceedings deprived him of his Eighth Amendment right to a reliable sentencing determination. We have concluded that any errors or assumed errors were not prejudicial. Viewing them cumulatively, we conclude defendant is not entitled to reversal of his judgment.

## VII. Conclusion

The judgment is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**ARMSTRONG, J.***

_____

*       Associate Justice, Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Blacksher

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S076582
**Date Filed:** August 25, 2011

_____

**Court:** Superior
**County:** Alameda
**Judge:** Larry J. Goodman

_____

**Counsel:**

Kathy Moreno, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Manuel M. Medeiros, State Solicitor General, Gerald A. Engler and Dane R. Gillette, Assistant Attorneys General, and Michele J. Swanson, Deputy Attorney General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kathy Moreno
P. O. Box 9006
Berkeley, CA  94709
(510) 649-8602

Michele J. Swanson
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5703